Thomas McKean, Appellant, *v.* Alexander Biddle, Robert M. Lewis, Pemberton S. Hutchinson, Ellison P. Morris, William Sellers, Craig Biddle, Ellis Yarnall, Morton P. Henry, Charles W. Wharton, J. Rodman Paul, John T. Morris, James May Duane and the Philadelphia Contributionship for the Insuring of Houses from Loss by Fire.

*Corporations—Dividends—Stockholders—Rights of majority—Mutual fire insurance.*

It is the inherent right of a trading corporation to divide its gains and profits among its members.

A corporation instituted to protect the owners of houses from loss by fire without any view of private or separate gain or interest, which has, as the result of prudent management, accumulated so large a fund as to make it safe and prudent to divide the net income from its invested funds, may make such dividend to its members:

Unanimity in the government of a corporation is not required, unless its charter so provides. It is one of the consequences of being a stockholder or member of a corporation that the will of the majority shall govern unless the fundamental articles provide otherwise.

A resolution adopted unanimously at a stockholders' meeting may be revoked at a subsequent meeting by a resolution adopted not unanimously.

Argued March 29, 1897. Appeal, No. 28, Jan. T., 1897, by plaintiff, from decree of C. P. No. 4, Phila. Co., March T., 1896, No. 943, dismissing bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and FELL, JJ. Affirmed.

Bill in equity for an injunction to restrain the distribution of a dividend.

The facts appear by the following opinion of the court below by ARNOLD, P. J.:

The Philadelphia Contributionship for the Insuring of Houses from Loss by Fire, was incorporated by the general assembly of the province of Pennsylvania, by an act passed February 27, 1768. It had been in existence as an unincorporated "Society for the Insurance of Houses from Loss by Fire upon the most equal Terms, and apart from all Views of private or separate

Gains or Interest" under articles of agreement dated March 25, 1752. The society was a mutual insurance company, of which those who were insured in it were the members, and as such entitled to take part in its government and participate in any division of profits it might make. The title of the act charter- ing the society states that it is intended " to ratify and confirm the Articles of Agreement of the Contributors, and to enable them to make suitable By-Laws for the better Management and Prosecution of their Designs." It was provided in the twenty- second item of the articles of agreement, or deed of settlement as it was called, that any general meeting of the members of the society should have full power " to alter and amend the present Articles and make any Additional Rules or Articles for the better and more orderly and successful or satisfactory Man- agement of the Affairs of this Society. At all which meetings the Determination of a Majority of the Members present shall be conclusive and binding on the whole Society."

Several important amendments have been made in the deed of settlement and the policy of the society. On April 14, 1781, it was resolved that houses which have a tree planted before them in the street should not be insured, and if any person in future plant any tree before his (insured) house in the street, and not remove it in three months from the time of planting, his insur- ance should be forfeited. This regulation against trees, it is said, led to the formation of another insurance company which would insure houses with trees in front of them. It was the custom in former years, and, indeed, it has been the custom down to a very few years past, for insurance companies to affix badges on houses insured by them. Some persons asserted that those badges were intended to stimulate the volunteer firemen of former days, prior to the establishment of the paid fire depart- ment by the ordinance of December 29, 1870, to extra exertion in saving houses insured in companies of which the volunteer firemen were members; but I incline to the belief that those badges were rather an advertisement than an appeal to selfish- ness in the performance of a duty. The fifteenth item of the deed of settlement requires the directors to attend all fires, there to consult and determine upon such methods as may most con- duce to the safety of the society and the service of the public. Insurance badges informed them which of the property in dan-

ger was insured in their society. The Philadelphia Contributionship badge consisted of four hands crossed and clasped at the wrist, by which the company came to be known as the Hand-in-Hand Insurance Company, while the badge of its rival had on it a green tree, by which it came to be known as the Green Tree Insurance Company. The policy of the society in regard to houses with trees before them was changed by a revision of the deed of settlement, made April 9, 1810, when it was resolved that houses and other buildings having trees planted before them may be insured in the society, but an addition to the usual deposit should be required in proportion to the risk such trees may occasion. On April 14, 1823, it was further resolved that such houses may be insured without any additional premium. It was probably the difficulty of throwing water from fire engines into houses with trees before them which led to the discrimination against them. Another important change made was in the duration of the insurance. By the deed of settlement the policies issued by the society were for terms of seven years, and the deposit money, or premium, was returned to the person depositing it, at the expiration of his policy, together with a dividend of the profits made in the meantime. By the revision of April 9, 1810, as amended April 14, 1836, it was resolved that every policy thereafter issued by the society should be made to continue in force for an unlimited period; that the society may, upon giving thirty days' notice, cancel any policy, and that the assured may, upon giving five days' notice and surrendering the policy, withdraw the deposit money, allowing a deduction of five per cent. The territory in which the company should insure has been changed from a limit of ten miles around Philadelphia, in Pennsylvania, to the entire state of Pennsylvania. The amount to be insured on one house has been changed from £500 to $10,000. These are important changes in the policy of the society.

No provision had been made for a reserve fund to meet large losses by extensive fires, and, as the members were responsible only for the amount of their deposits or premiums and one half their deposits in addition, it was deemed advisable to make provision for a surplus or reserve fund to meet any extraordinary losses. To provide such a fund, at a meeting of the contributors, held in April, 1763, the following questions were put:

" First, whether it will not be as beneficial that the Interest money arising from the Stock should be carried to one Common Account and be applied as directed by the twenty-first Article of the Deed of Settlement in discharging the expenses of the Office, the surplus or remainder may be paid towards satisfying any loss that shall happen by Fire, as to be at the extraordinary trouble and expense in calculating each Contributor's proportion of interest and crediting him therewith, and debiting his account with his proportion of all the expenses of said Office, and his contribution to every fire.   Second, that no part of the Deposit Money shall be expended in repairing or paying for any Damage done by fire until the balance of the Interest Money, as shall be accrued to the time of such fire, be first expended ; which was unanimously agreed to " in the language used in the minutes.

Since that time, 1763, dividends have not been paid, and the stock or store, securities or joint effects, surplus or reserve, accumulation or assets, of the society, by whatever name they may be called, have increased to such a marvelous extent, as to put the securities of the company in peril from those who would dissipate its property, or the escheator, who would urge the public safety as a reason for sweeping its rich fund into the public treasury.

The society had on hand December 3, 1895, assets valued at $4,258,040.17, and the amount of insurance by it then outstanding was $14,573,908.   The practice of the company in regard to the duration of its policies has been changed, as before stated, and it now issues perpetual policies of insurance, which it can cancel at any time, by returning the deposit money, while the holders of its contracts may surrender them at any time and demand a return of the deposit money.   As the whole amount of deposit money or premium in the possession of the company, and liable to be returned to its policy-holders, is only $495,659.63, it is plain to be seen that under either plan of cancelation, there would be a surplus left of several millions of dollars.   Of course, no scheme of returning the deposit moneys for the purpose of securing this rich sum for a few who might be permitted to remain, would be permitted or sanctioned by the courts.

In view of the large fund in the hands of the company, and the large amount of interest annually earned by it, the corporation, at a meeting held February 18, 1895, adopted the following resolution :

" Resolved, That the present assets of the company shall remain intact, and that the directors be and they are hereby authorized from time to time, at their discretion, to distribute among the policy-holders of the corporation, in proportion to their deposits held by the company on policies in force respectively, such portion of the net income from invested funds as they may deem safe and prudent, after providing for losses and depreciation of assets, and making such additions to the assets as they may deem expedient; provided, that all deposits made after this date shall remain at least ten years before the holder of policies issued thereon shall receive any benefit under this resolution; provided, further, that all deposits received shall be added to the assets of the company."

At a stated meeting of the directors of the corporation, held November 20, 1895, the following resolution was passed: " That we deem it safe and prudent, out of the net income from invested funds, to distribute among the policy-holders ten per cent of their deposits held by the company, and which has been so held prior to February 18, 1895, on policies in force at this date."

It was further resolved at a subsequent meeting of the directors that the ten per cent above mentioned should be payable to the contributors on July 1, 1896.

The plaintiff, who, in his own right, and as executor of his father's will, holds several policies issued by the company on and between November 16, 1838, and May 6, 1871, amounting to $35,250 of insurance for $1,190 of deposits, has filed a bill to have the resolutions of February 18, 1895, and November 20, 1895, for the payment of a dividend, declared illegal and void, and the corporation enjoined from paying the same.

The company is included in that class of corporations known as trading corporations, one of the inherent rights of which is the right to divide their gains and profits among their members; and while this corporation was instituted to protect the owners of houses from loss by fire, apart from all views of private or separate gains or interest, yet the result of prudent management for more than a century has been the accumulation of so large a fund that, whether gain or interest was in view or not, it is now deemed safe and prudent to declare dividends from the net income from its invested funds.

We have given careful consideration to the argument of the learned counsel for the plaintiff, and are unable to find any legal objection to the declaration and payment of the dividend authorized by the contributors and directors. The argument that the dividend will reduce the amount of the stock or assets of the company, to which the plaintiff looks for indemnity in the case of loss, might, if carried to an extreme, prevent the payment of dividends by any corporation. The possibility that in the future the company may become involved in losses on risks assumed by it might be urged against the payment of dividends by any company, be it insurance, banking, transportation, manufacturing or any other trading corporation. This mere possibility is no reason for enjoining the payment of a dividend. Every business or trading corporation has a right to declare and pay dividends to its members (Morawetz on Corp., sec. 446; Thompson on Corp., sec. 2128), and it also has the right to pass its dividends for a time in order to accumulate a surplus and strengthen the company. That is what was done by the defendant corporation in this case. Having accumulated enough, in the judgment of the members, to make it safe and prudent to resume the division of its profits, it has the right to make such division: McLean v. Pittsburg Plate Glass Co., 159 Pa. 112. The basis of the division is a matter for the members to decide in the present case, and that adopted is entirely equitable. The tenth paragraph of the deed of settlement as revised April 10, 1810, provides that all persons insuring in this society shall have the stock of the society as a security for the payment of any loss that may happen by fire. If we give the word stock a restricted meaning, so as to confine it to the deposit moneys or premiums paid to the society, justification for which may be found in the twelfth item of the deed of settlement, before any accumulation of interest or surplus was provided, we find that it now has a surplus of invested funds over and above the deposit moneys, amounting to nearly $4,000,000, the interest on which is more than sufficient to pay the dividend authorized by the contributors and declared by the directors. The argument that the resolution of 1763 stands in the way of a dividend is clearly untenable. That resolution is no part of the contract between the plaintiff and the company. It was not held out to him as an inducement for insuring in the company, nor was any

promise made to him that it would not be repealed. It was part of the policy of the company in regard to the management of its business, and is subject to the same liability to change as any other policy of its management. That resolution, depending upon the vote of the contributors, was revoked by the same authority which made it. It is no part of the charter or fundamental law of the corporation, or beyond the reach of a repeal by the contributors. · Nor does it make any difference that the resolution of 1763 was adopted by a unanimous vote, while the resolution of February 18, 1895, was not unanimous. Unanimity in the government of a corporation is not required, unless its charter so provides. It is one of the consequences of being a stockholder or member of a corporation that the will of the majority shall govern, unless the fundamental articles provide otherwise. No such provision appears in the charter of the defendant company. On the contrary, the deed of settlement expressly provides that at any meeting of the society, the determination of a majority of the members present shall be conclusive and binding on the whole society. We are of opinion that the contributors had ample authority to adopt the resolution of February 18, 1895, and that the directors had authority to declare the dividend of ten per cent by the resolution of November 20, 1895.

We therefore refuse the injunction, and dismiss the plaintiff's bill with costs.

*Error assigned* was decree dismissing bill.

*George Wharton Pepper* and *Geo. Tucker Bispham*, for appellant.—The result of the decree of the court below, refusing the plaintiff the relief asked for in his bill, will be to produce an unequal and, therefore, an inequitable distribution of corporate earnings.

There is no authority in the charter of the defendant corporation for the declaring of dividends on perpetual policies : Hawes v. Oakland, 104 U. S. 450. ·

Even if the corporation possesses the power to declare dividends or perpetual policies, it may not exercise that power against the will of a single dissentient : Light & Co. v. Washington Fire Ins. Co., 87 Pa. 207 ; Ins. Co. v. Connor, 17 Pa.

136; Bradfield v. Union Mut. Ins. Co., 9 W. N. C. 436; Livingston v. Lynch, 4 Johns. Ch. 573.

The word "stock" is consistently used in every one of the documents as meaning the entire fund of the society applicable to the payment of losses and expenses under the rules existing at the time.

No principle of partnership law is better settled than that a single dissenting member may restrain any united act of his fellows which is in violation of the partnership agreement: Natusch v. Irving (Gow on Partnership, App., 576 ); Const v. Harris, 1 Turn. & R. 496; Menier v. Hooper's Telegraph Works, L. R. 9 Ch. 350; Griffith v. Paget, L. R. 5 Ch. D. 894; Holmes v. New Castle-upon-Tyne Freehold Abattoir Co., L. R. 1 Ch. D. 682; In re National Funds Assurance Co., 10 L. R. Ch. D. 118; Flitcroft's Case, L. R. 21 Ch. D. 519; Guinness v. Land Corporation of Ireland, L. R. 22 Ch. D. 349; In re Denham & Co., L. R. 25 Ch. D. 752; Heed's Estate, Building and Investment Co. v. Shepherd, L. R. 36 Ch. D. 787; Macdougall v. Jersey Imperial Hotel Co., 2 Hem. & M. 528; Kean v. Johnson, N. J. Eq. 401; Zabriskie v. R. R., 18 N. J. Eq. 178.

*William W. Montgomery* and *John C. Johnson*, for appellees.


PER CURIAM, May 24, 1897:

A careful consideration of this record has satisfied us that there is no substantial error in the conclusions reached by the court below.

For reasons given in its opinion the decree should not be disturbed.

Decree affirmed and appeal dismissed at plaintiff's costs.