## EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES v. BOWERS.
### No. 16.

Circuit Court of Appeals, Second Circuit.
Feb. 1, 1937.

Lamar Hardy, U. S. Atty., and Edward J. Ennis, Asst. U. S. Atty., both of New York City, Edward H. Horton, Sp. Asst. to the Atty. Gen., Walter W. Mahon, of Washington, D. C., and David L. Marks, Sp. Asst.·to·the U. S. Atty., of New York City, for appellant.

Alexander & Green, of New York City (Edward W. Bourne and James H. McIntosh, both of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment for the plaintiff in an action for money had and received against the executor of a collector of internal revenue, to recover a capital stock tax collected under section 1000 (c) of the Act of 1918 (40 Stat. 1126), for the years ending June 30, 1919, 1920, 1921 and 1922. The issue as to the first three years is whether the plaintiff was a "mutual insurance company" under subdivision (c), or whether it was a stock company under subdivisions (a) and (b). The issue as to the fourth year is whether, although concededly nothing was due (New York Life Insurance Co. v. Bowers, 283 U.S. 242, 249, 51 S.Ct. 399, 402, 75 L.Ed. 1005), the plaintiff's claim for refund was insufficient, because it did not state as a ground of recovery the remission of the tax by the Act of 1921 (42 Stat. 227).

The plaintiff was incorporated in 1859 pursuant to the New York General Insurance Act of 1853, c. 463. It was to do a life insurance business upon a capital stock of one thousand shares of $100 each, the dividend on which was limited to 7%; any surplus to be accumulated and credited to policyholders in proper proportions. The powers were vested in a board of fifty-two directors, elected by the stockholders alone, unless by a vote of three-fourths of the directors all policyholders of more than $5000 should also be allowed to vote. In 1906 this charter was amended by limiting the votes of the stockholders to twenty-four directors and giving the policyholders the sole vote for twenty-eight; but the Court of Appeals of New York, in February, 1909, declared that part invalid which attempted to limit the shareholders' vote. Lord v. Equitable Life Assur. Soc., 194 N. Y. 212, 87 N.E. 443, 22 L.R.A.(N.S.) 420. There had been agitation to mutualize the company before 1911, and a majority of the shares had been put into the hands of trustees to vote in accordance with the wishes of the policyholders. They continued to be held in trust until a plan of mutualization, authorized by sections 16 and 95 of the Insurance Law of New York (Consol.Laws, c. 28), as amended by Laws 1917, c. 301, §§ 1, 2, was approved by the directors on July 19, 1917; by a majority of stockholders on August 21, 1917; by the policyholders on December 6, 1917; and by the Superintendent on February 6, 1918. This plan provided that the plaintiff should at once buy 564 shares of stock and the re-maining 436 shares in the future at a price not exceeding $1500; that at all future elections each policyholder of more than a year's standing might vote for all the directors; and that three trustees should hold the shares "in trust for the policyholders of the Society as provided by law until all of the capital stock is acquired." Before July 1, 1918, the plaintiff had bought out of its own funds and transferred to the trustees 977 of the 1000 shares; it acquired four shares in 1921, four in 1922, seven on May 4, 1925, and the remaining eight on June twenty-third in the same year. Thereupon on July 16, 1925, the directors accepted the trustees' report, discharged them of their trust, retired the stock, and then at least, as both sides agree, the plaintiff became completely mutualized.

We think that during the years here in question the trustees were bound to vote the shares held by them for those directors whom the policyholders chose by their own votes at a general election, in spite of the fact that by the terms of the trust they merely held them "in trust for the policyholders." They would probably have been bound so to vote, regardless of what had gone before. If they had any discretion, they became vested with a tutelar authority to select directors in the best interests of the policyholders, regardless of their wishes, expressed in the only way that they could be expressed—at an annual election. That would contradict the whole purpose of the plan. The trustees were not to manage the company in any event; their duties as shareholders were necessarily confined to selecting the directors who were in turn to have charge. The shares had become the company's, which meant the policyholders'; the policyholders were sui juris and needed no tutelar trustees. The situation was only a halfway house to complete mutualization, at which time concededly the policyholders would have the entire voting powers. The "trust" of the shares was therefore a "dry trust" in the sense that the trustees had no active powers and no discretion; they would not have been permitted to assert their legal title, contrary to the will of the policyholders. If, however, it be thought that the question might have been an open one, if res integra, the practice of the preceding twelve years forecloses any doubt. As has already appeared, the trust of 1905, the "Ryan Trust," had expressly provided that

the trustees should cast their votes as the policyholders wished; and that trust was irrevocable. Both the second, the "Morgan," and the third, the "DuPont," trust required the trustees to do the same; at least the report of the mutualization committee declares that the "DuPont Trust" was "on substantially the same terms as had previously existed," and "previously" would appear to mean, from the outset. These second and third trusts were revocable it is true, but we are speaking of the trustees' duties while they lasted. Moreover, the trustees had never failed to vote like the policyholders, though it must be admitted that this counts for little, for there had never been an opposition. We conclude that on July 1, 1918, and thereafter not only were the policyholders entitled to all of the income except $161, but they could vote upon 977 of the 1000 shares, as well as upon their policies; no other interest or power was outstanding but the twenty-three shares. The question is whether the company had become a mutual company under subdivision (c).

 ‧ We agree that for all purposes of the New York Insurance Law it had not; the language of section 16 is express that only when the last share had been acquired could any shares be cancelled; "thereupon * * * the corporation shall be and become a mutual life insurance corporation without capital stock." It does not follow, however, that subdivision (c) of section 1000 used the phrase in the same sense. Federal revenue acts at times do make it plain that their language incorporates state usage by reference. Crooks v. Harrelson, 282 U.S. 55, 62, 51 S.Ct. 49, 51, 75 L.Ed. 156. For example, when excises are imposed upon the passage of interests or estates of the taxpayers, the local definitions of what these are, will ordinarily control. But generally speaking our revenue statutes make their own definitions, and are not to be assumed to accommodate themselves to local variants. Weiss v. Wiener, 279 U.S. 333, 337, 49 S.Ct. 337, 338, 73 L. Ed. 720; Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199. And indeed in the case of this very statute the Supreme Court has held that a local classification should not prevail. Bowers v. Lawyers' Mortgage Co., 285 U.S. 182, 188, 52 S.Ct. 350, 353, 76 L.Ed. 690. We are therefore to consider what was the meaning of the word in subdivision (c), independently of any gloss that the New York

law had just put upon it. Its general meaning is plain enough and not disputed; the question, so frequent in legal controversies, is how far in its application form shall prevail over substance. We have been often admonished that when dealing with taxes it should not. United States v. Phellis, 257 U.S. 156, 168, 42 S. Ct. 63, 65, 66 L.Ed. 180; Weiss v. Stearn, 265 U.S. 242, 254, 44 S.Ct. 490, 491, 68 L. Ed. 1001, 33 A.L.R. 520; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596, 97 A.L.R. 1355. This seems an instance where the admonition is especially in place. If for example all the shares had been actually transferred to the policyholders, though not yet formally cancelled and retired, we should suppose that no one would say that the company had not been mutualized; the usufruct and control would in that case have been legally in their hands. We see no difference if the shares were conveyed to trustees, who were bound to vote them as the policyholders voted. The outstanding legal title would not count; a company is mutual when there is no group but the policyholders who have interest in it, or power over it; Penn Mutual Company v. Lederer, 252 U.S. 523, 535, 40 S.Ct. 397, 401, 64 L.Ed. 698; no legal scaffolding can conceal these fundamental facts. Thus the question is only as to the few shares—twenty-three or less—held by others during the period in question. One may take them as equal to a claim of $34,500 upon the assets, and of $161 a year upon the income; neither is considerable enough to matter, nor are both together. Their owners could vote, it is true, but again their influence upon any control was nil for all practical purposes.

 We assume indeed that in choosing between subdivisions (b) and (c) we should give the taxpayer the benefit of any doubt (Gould v. Gould, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211); but the canons must not overbear a patent purpose, apparent in the words chosen. It is true that nobody has been able to find any reason for the distinction made between stock companies and mutual; probably none was really intended; and indeed one would expect that, if there were to be favors, they would go to mutual companies. But it is not a reason for perverting the natural meaning of the words that we cannot fathom why they were used at all, or that we may suspect that they never would have been, had

690

they been understood. For good or ill Congress deliberately treated mutual companies differently; it must be the actual nexus of its rights and duties, not its name or form, which decides whether a company falls within one class or the other; else we weight our interpretation with a bias against the disclosed intent. It seems to us that the plaintiff was a mutual company for the first three years and that the collections were lawful.

■ For the fourth year the situation is concededly different. The tax was not due, though nobody knew that it was not when it was collected, and the first contrary intimation, so far as we have found, was Judge Mack's decision in 1929, New York Life Ins. Co. v. Bowers (D.C.) 34 F.(2d) 60, which first we, and then the Supreme Court, affirmed. 39 F.(2d) 556; 283 U.S. 242, 51 S.Ct. 399, 75 L.Ed. 1005. The claim for refund was filed in 1926 and contained all the facts necessary to its validity, which was all that the regulations required at the time (Article 1304, Regulations 69). They were changed in 1929 so that the "grounds" as well as the "facts" must appear (Regulations 86, Articles 322, 323); but so far as that counts at all, it is in the plaintiff's favor. The defendant's position must be that the first regulations were unauthorized; obviously they were intended to be comprehensive. We cannot see why they were, the statute being silent. The Treasury may no doubt be surprised as well by a new legal position as by new facts, but the consequences in the two cases are very different. Any new legal position disclosed at a trial can be met without more preparation than is always accorded by a fair judge; but preparation to meet new facts generally has to be made in advance; witnesses must be found and examined, documents turned up, and so on. It is nevertheless true that even under the old regulations courts have required the claim to state the legal grounds, and have beaten taxpayers for that reason. Stevens Co. v. United States, 53 F.(2d) 1 (C.C.A. 5), is not among these decisions, for the taxpayer sought to prove facts not stated in the claim; and the same appears to have been also the case in Electric Power & L. Corp. v. United States, 1 F.Supp. 773 (Ct. Cl.); Jones & Co. v. Lucas (D.C.) 33 F. (2d) 907, affirmed 64 F.(2d) 1018 (C.C.A. 6), and Connell v. Hopkins, 43 F.(2d) 773 (D.C.Tex.). But in Mutual Life Ins. Co. v. United States, 49 F.(2d) 662, the Court

of Claims held as we have just said, and perhaps it did so also in Grays Harbor Motorship Corp. v. United States, 45 F. (2d) 259, though the report is somewhat obscure. We cannot agree; we see no reason to declare the regulations bad, nor any justification for withholding money to which confessedly the Treasury was never entitled. The plaintiff may hold its judgment for the fourth year.

Judgment reversed; new trial ordered.