KEYSTONE AUTOMOBILE CLUB CASUALTY CO. v. COMMISSIONER OF INTERNAL REVENUE.

KEYSTONE AUTOMOBILE CLUB FIRE CO. v. SAME.

No. 7632.

Circuit Court of Appeals, Third Circuit.

Sept. 10, 1941.

Rehearing Denied Oct. 30, 1941.

John W. Davis, of New York City (R. Lester Moore, of Philadelphia, Pa., and Todd Daniel, of Philadelphia, Pa., on the brief), for petitioners.

Newton K. Fox, of Washington, D. C., (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before BIGGS, CLARK, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

Tax liability in this case turns upon the mutual or cooperative character of the petitioners. There are involved tax deficiencies of $167,331.06 for the years 1929 to 1935 inclusive.

The history of the petitioners, Keystone Automobile Casualty Co. and Keystone Automobile Club Fire Co., begins with the organization on March 23, 1925, of the Insurance Exchange of the Keystone Automobile Club. The Club was a cooperative association organized as a non-profit corporation under the laws of Pennsylvania to promote the interest of motorists and to furnish various facilities and services to its members. The Insurance Exchange was organized by the Club with a loan of $25,000 to write automobile casualty and fire insurance.

On May 31, 1928, the Club in order to accommodate members in New Jersey, where an insurance exchange was not permitted to operate, reorganized the Exchange by the incorporation under Pennsylvania law of a casualty insurance company and a fire insurance company, the petitioners in this case. The Club paid into the treasury of the petitioners $450,000, the minimum capital requirements for such companies, for which it received the entire capital stock of the petitioners.[1]

In November, 1930, the statutory capital of the petitioners was increased from $450,000 to $750,000. The increase was made in order to meet the requirements of the Financial Responsibility Law of the State of New York. The increase was effected by the transfer from the contingent reserve to the capital and surplus accounts of the necessary amounts. A stock dividend of $100,000 was declared by each company and additional shares of stock representing the stock dividends were issued to the Club.

As of December 31, 1935, the capital and surplus of the petitioners amounted to $750,000 and their contingent reserve amounted to $719,301.33—a total of $1,469,301.33. The present expectation, however, is that upon the liquidation of the petitioners the Club would receive only $450,000.[2]

---

[1] The articles of agreement of the two companies provide that "The plan or principle on which the business is to be conducted is the joint stock plan or principle."

[2] On October 28, 1938, the members of the Club adopted the following amendment to the By-laws: "In the event of . the final dissolution of either Keystone Automobile Club Casualty Company or Keystone Automobile Club Fire Company, the entire proceeds of such dissolution, after the reimbursement of the Club of the amounts which it has contributed as capital and surplus (without interest), shall be divided equitably among the then policyholders of the said company."

The petitioners in the tax years involved insured members of the club and also members of two other automobile clubs, the Delaware Automobile Association and the Pittsburgh Motor Club. On the average they insured 35,121 of the 42,493 members of the Keystone Club and, in addition, 5,171 members of the other clubs. All policyholders were treated alike—they were charged premiums at about 10%, until 1932 and thereafter at about 20% less than those of ordinary stock companies and were refunded 25%, until 1932 and thereafter 10%, of the premiums.

The members of the Keystone Club elected the Club's officers and directors. The persons so chosen elected themselves, by proxy from the Club, officers and directors of the petitioning companies. Policyholders of the other two clubs had no power to vote, although it was provided that they could become members of the Keystone Club upon payment of annual dues.

Under these facts it is necessary to determine whether two provisions of the Revenue Acts dealing with mutual insurance companies are applicable to the petitioners. One provision, § 103(11) of the Revenue Acts of 1928 and 1932 and § 101 (11) of the Revenue Act of 1934, 26 U.S. C.A. Int.Rev.Code, § 101(11), exempts: "Farmers' or other mutual hail, cyclone, casualty, or fire insurance companies or associations (including interinsurers and reciprocal underwriters) the income of which is used or held for the purpose of paying losses or expenses;" · The other provision, § 208(c) (3) of the Revenue Acts of 1928 and 1932 and § 207(c) (3) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Code, § 207(c) (3), permits deductions as follows: "In the case of mutual insurance companies (including interinsurers and reciprocal underwriters, but not including mutual life or mutual marine insurance companies) requiring their members to make premium deposits to provide for losses and expenses, the amount of premium deposits returned to their policyholders and the amount of premium deposits retained for the payment of losses, expenses, and reinsurance reserves." The court finds it unnecessary to determine whether the petitioners have retained income or premium deposits for the purpose of paying losses or expenses[3] because of the conclusion of the court that the petitioners are not mutual insurance companies.

■ A determination of the mutual or cooperative[4] character of an enterprise within the meaning of a statute requires first an analysis of the legislative intent of what is meant by the word "mutual" as disclosed by the statute. Such an analysis, however, fails to disclose any statutory specifications for a mutual organization.[5] It becomes necessary, therefore, to determine the normal attributes of a mutual organization.

■ Counsel for petitioners contend that "the primary and fundamental character-

---

[3] This problem is treated in Driscoll v. Washington County Fire Ins. Co., 3 Cir., 1940, 110 F.2d 485, certiorari denied, 1940, 311 U.S. 658, 61 S.Ct. 12, 85 L.Ed. —; MacLaughlin v. Philadelphia Contributionship, etc., 3 Cir., 1934, 73 F.2d 582, certiorari denied, 1935, 294 U.S. 718, 55 S.Ct. 544, 79 L.Ed. 1251; Baltimore Equitable Soc. v. United States, Ct.Cl.1933, 3 F.Supp. 427, certiorari denied, 1933, 290 U.S. 662, 54 S.Ct. 77, 78 L.Ed. 573.

[4] The Supreme Court in Penn Mutual Co. v. Lederer, 1920, 252 U.S. 523, 533, 40 S.Ct. 397, 400, 64 L.Ed. 698 points out variations in types of mutual companies but recognizes that they are all cooperative enterprises. "In other words, these mutual companies are alike in that they are co-operative enterprises."

[5] The Revenue Acts contain many references to mutuals and co-operatives. Thus § 103 of the Act of 1932 exempts from taxation:

"Mutual savings banks not having a capital stock represented by shares; * * *

" * * * cooperative banks without capital stock organized and operated for mutual purposes and without profit; * * *

"Farmers', fruit growers', or like associations organized and operated on a co-operative basis. * * * Exemption shall not be denied any such association because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per centum per annum, whichever is greater * * *." The contention that the statute recognizes that mutuals can be stock organizations turns upon the question of whether the words "not having a capital stock" or "without capital stock" are words of limitation or words of description. For reasons referred to in the course of the opinion a decision of this question is unnecessary.

istic of a mutual insurance company is that it be organized· and operated exclusively for the purpose of furnishing insurance at cost to its policyholders." This ignores an equally fundamental characteristic of mutual or cooperative organizations —democratic ownership and control.[6] In his dissenting opinion in Frost v. Corporation Commission, 1929, 278 U.S. 515, 536, 49 S.Ct. 235, 243, 73 L.Ed. 483, Mr. Justice Brandeis has pointed out that the aim of cooperatives is "economic democracy on lines of liberty, equality and fraternity." The Supreme Court in Penn Mutual Co. v. Lederer, 1920, 252 U.S. 523, 535, 40 S. Ct. 397, 401, 64 L.Ed. 698, has stated: "The real difference between the two classes of life companies as now conducted lies in the legal right of electing directors and officers. In the stock company stockholders have that right; in the mutual companies the policyholders who are the members of the corporation."

■ It is true that minor or mere formal departures from the norm do not foreclose the matter. There is no legal litmus test to determine by color reaction the classification of an organization. "* * * it must be the actual nexus of its rights and duties, not its name or form, which decides whether a company falls within one class or the other * * *." L. Hand, J., in Equitable Life Assur. Society v. Bowers, 2 Cir., 1937, 87 F.2d 687, 690. A substantial departure from a fundamental requirement of a mutual company would preclude the court from giving the petitioners the freedom from taxation which they seek. Such a departure is present here.

■ The petitioners sought insurance and obtained insurance from non-members of the Club who in no way participated in the control of the petitioners. Conversely, many members of the Club were not policyholders, but nonetheless had the same control of the affairs of the petitioners as did policyholders. It cannot be said that these departures from the fundamental principle of control are de minimis, for at least two reasons. First, the percentages of departure are substantial; that is, on the average, 17½% of the policyholders could not vote and, conversely, non-policyholders exceeding 20% of the voting policyholders had the right to vote. Second, it was the regular and established policy of the petitioners to permit these departures. The departures were not made necessary by peculiar facts nor were they rare and infrequent. Furthermore, this is not a case like United States v. Cambridge Loan & Building Co., 1928, 278 U. S. 55, 49 S.Ct. 39, 73 L.Ed. 180, dealing with an exemption to building and loan associations where the Supreme Court found that it was normal and customary and, in fact, necessary at times for such associations to deal with non-members.

It is contended on behalf of the government that a stock corporation, and particularly a corporation which under State law is not considered a mutual corporation, cannot be a mutual organization under the federal tax laws. This case does not take us that far. Just as a corporation which is mutual in form may not be mutual in ˙fact, Driscoll v. Washington Co. Fire Ins. Co., supra, a company organized as an

---

6 "Under concepts of Anglo-American law, the owner of a corporate undertaking is said to be the corporation. The convenience of stating all the consequences of compliance with an incorporation statute, in terms of a fictitious person justifies the fiction so long as the basic facts underlying the fiction are not overlooked. As to a cooperative, it will be shown that it is particularly important to remember that the association is an organization of individuals rather than a mere abstract and impersonal entity.

"The personal character of the ownership in a cooperative is one of the main distinctions between the cooperative and the ordinary corporation." Packel, The Law of Cooperatives (1940) 68.

"* * * The personal character of the ownership of the cooperative, already discussed in the previous chapter, would of itself tend to personal control over the cooperative. Much more important however, is the general cooperative principle of 'one person one vote.'" Packel, supra, pp. 85, 86.

"Members of mutual insurance companies and of mutual benefit societies, the legal status of which is that of insurance companies, sustain a dual relation, each member being at once the insured and the insurer." 1 Couch on Insurance (1929) 491.

"The society was a mutual insurance company, of which those who were insured in it were the members, and as such entitled to take part in its government and participate in any division of profits it might make." McKean v. Biddle, 1897, 181 Pa. 361, 37 A. 528.

ordinary capital stock company may, in fact, it has been held, be a mutual company. An illustration is seen in Equitable Life Assurance Society v. Bowers, supra, where substantially all shares were held in an actual trust for the policyholders in order to effect a transformation of the company from a stock basis to a mutual basis.

The petitioners contend that in effect the shares issued by them were held in trust for the benefit of policyholders. But that trust, assuming it exists, is controlled by the members of the Keystone Club, as such, and not by the policyholders. The members of the Club indirectly control the shares and can vote them so that Club members, as such, may benefit instead of policyholders. The amendment to the By-laws, adopted by the Club in 1938, is not only after the fact in this case but also can be changed by the Club members whose interests are not necessarily consistent with those of policyholders.

It is also contended on behalf of the petitioners that Article 1014 of Regulations 74 permits the petitioners, even if they are stock companies, to make a return as though they were mutual companies. The Regulation provides: " * * * A stock fire insurance company, operated on the mutual plan to the extent of paying dividends to certain classes of policyholders, may make a return on the same basis as a mutual fire insurance company with respect to its business conducted on the mutual plan." The government contends that this Regulation applies only to stock fire insurance companies and not casualty companies and that in any event the company must be "operated on the mutual plan." If the Regulation seeks to make a distinction between fire insurance companies and casualty companies the court considers it an attempt to amend the statute by regulation. If the Regulation purports to extend the statute by making it applicable to non-mutual insurance companies to the extent that they write participating policies the court, likewise, thinks it is ineffective. The Act is clear that the provisions here involved are applicable only to mutual insurance companies.[7] Regulations cannot amend the statute by granting an exemption or deduction for which the statute makes no provision. Thus Mr. Justice Roberts said in Koshland v. Helvering, 1936, 298 U.S. 441, 446, 447, 56 S.Ct. 767, 770, 80 L.Ed. 1268, 105 A.L.R. 756: "Where the act uses ambiguous terms, or is of doubtful construction, a clarifying regulation or one indicating the method of its application to specific cases not only is permissible but is to be given great weight by the courts. And the same principle governs where the statute merely expresses a general rule and invests the Secretary of the Treasury with authority to promulgate regulations appropriate to its enforcement. But where, as in this case, the provisions of the act are unambiguous, and its directions specific, there is no power to amend it by regulation." The petitioners, therefore, can get no relief from the regulation, assuming that it is subject to the construction for which they contend.

The separate classification of mutual or cooperative organizations is a matter of legislative policy. It is the duty of the administrative agency, as well as the duty of this court, to effect that policy and, accordingly, to deny the freedom from tax liability to the petitioners because they are not mutual insurance companies.

The decisions of the Board of Tax Appeals are affirmed.

[7] "We do not think the provision for exemption applied to a company that was partly mutual and partly not. Such a holding would, we think, extend the exemption to cases that were not within the intention of Congress, for there would be no way of drawing the line except to say that when a large proportion of the insurance written was not upon the mutual plan the company was not a mutual company, and that when only a small proportion was so written the association still remained mutual." Baltimore Equitable Soc. v. United States, supra, 3 F.Supp. at 432, note 3.