Edwards'
Lessee
v.
Darby.

---

[LOCAL LAW.]

## EDWARDS' Lessee *against* DARBY.

Under the act of North Carolina of 1782, for the relief of the officers and soldiers in the continental line, &c., the commissioners having determined that the *French lick* was within the reservations of the statute, as public property, and having surveyed the said reservation in 1784, the same was protected from individual survey and location, although it exceeded the quantity of 640 acres.

The *French lick* reservation has not been since subjected to appropriation, by entry and survey, as vacant land, by any subsequent statute of North Carolina or Tennessee.

THIS cause was argued by Mr. *Talbot*, for the plaintiff, and by Mr. *Eaton*, for the defendant.

1827.

Edwards'
Lessee
v.
Darby.

Jan. 24th.

Jan. 29th.

Mr. Justice TRIMBLE delivered the opinion of the Court.

This is a writ of error to a judgment of the Circuit Court for the Western District of Tennessee.

The plaintiff prosecuted an action of ejectment in that Court, to recover possession of a small tract of 20 or 30 acres of land, which had been laid out in lots and squares as part of the town of Nashville, the tenants in possession being the owners or occupiers of such lots.

In the year 1818, Patrick H. Darby appropriated, by entry and survey, all that part of the town from lot No. 141, to lot No. 165, the latter inclusive ; and having obtained a grant therefor from the State of Tennessee, he, before the institution of the suit, conveyed the land by deed to Edwards. This was the plaintiff's title.

'The legislature of North Carolina, by an act passed in the year 1782, entitled, " An act for the relief of the officers and soldiers in the continental line, and for other purposes therein mentioned," enacted, that certain bounties in land should be granted to the officers and soldiers in the line of that State, on continental establishment.

The seventh section of the act, after reciting that, " Whereas, in May, 1780, an act passed reserving a certain tract of country to be appropriated to the aforesaid purposes, and that it had been represented to the assembly that sundry families had, before the passing of the said act, settled on the said tract of country, enacts that 640 acres of land shall be granted to each family, or head of a family, and to every single man of 21 years or upwards, (to include their improvements,) settled on said land before the first day of June, 1780, for which they shall have the right of pre-emption ; provided no such grant shall include any salt licks or salt springs. which are hereby declared to be reserved as public property, together with 640 acres of the adjoining lands, for the common use and benefit of the inhabitants of that country, and not subject to future appropriations ; and all the remainder of the aforesaid tract of

country shall be considered as subject to partition as by this act directed."

The eighth section appoints commissioners in behalf of the State, " to examine and superintend the laying off the land in one or more tracts, allotted to the officers and soldiers."

The eleventh section authorizes the commissioners to appoint one or more surveyors, for the more speedy and effectual laying off and surveying said lands.

The commissioners, in the exercise of their powers in carrying this act into effect, determined the French lick to be within the scope of its provisions, and a proper object of such reservation, and caused a survey to be made of said reservation as early as 1784, which turns out to include six hundred and sixty-seven and three quarter acres, instead of six hundred and forty, and embraces within its limits the whole of the lots laid off in the town of Nashville, and the land covered by the grant to Patrick H. Darby.

In the year 1784, the legislature of North Carolina, by its act, appropriated 200 acres, part of said reservation, for the establishment of the town of Nashville, to be laid off at the bluff on the Cumberland river, nearest the French lick; and commissioners are designated in the act to lay out the proposed town in streets, lots, and squares; to cause a plan thereof to be made out; and to sell and dispose of the lots in the town when thus laid off.

Upon the trial of the general issue in the Circuit Court, after the plaintiff had given in evidence the grant to Darby, and conveyance from Darby to Edwards, already recited, the defendants gave evidence conducing to prove that the survey made of the reservation around the French lick, by the commissioners, as early as 1784, included the whole of the land granted to Darby, and then in controversy; and also, that the commissioners, or trustees, for laying off the town of Nashville, had, in the year        laid off and disposed of a part of the town lots; and that, afterwards, the commissioners had laid off and disposed of the additional lots, to 165 inclusive, about the year 1789, or 1790; but it appeared that the quantity of 200 acres was thereby exceeded by 20 or 30 acres, such excess covering the lots

from 141 to 165 inclusive, but the whole of which lay within the French lick reservation, as laid off by the commissioners about the year 1784.

The Court instructed the jury, that if they found the land in controversy, and within Darby's grant, was also within the boundary of the town as actually laid off, although that boundary exceeded the quantity of 200 acres, or if they found it was within the actual survey of the French lick reservation, as laid off in 1784, although it exceeded the quantity of 640 acres, the land was protected from individual appropriation by entry and survey, both by being so within the town boundary as laid off, and within the reservation as laid off, or if not by both, it was so protected by being included within the latter; and that, consequently, the grant to Darby was void.

To this opinion and instruction the plaintiff excepted, and his exception was sealed, and made part of the record.

It is not necessary to decide whether the land in controversy would, or would not, have been protected from individual appropriation by being actually laid off and disposed of as town lots, beyond the quantity of two hundred acres, as we are all of opinion it was so protected by being within the French lick reservation, as laid off.

It is argued, that the commissioners, appointed by the act of 1782, were not authorized to cause surveys to be made of the reservations of 640 acres around the reserved salt licks and springs, that the reservation was by quantity only, and that no legal effect can therefore be attributed to the survey. We admit the statute does not give the authority to survey the reservations, in express terms, but do not admit that the authority may not, and does not, result by necessary implication from the duties they were expressly required to perform, and from the general provisions of the statute. They were not expressly required by the statute to determine what licks and springs were proper objects for reservation, and came within the provisions of the statute; but they were required to lay off and cause to be surveyed the lands granted to the officers and soldiers, subject to, and so as not to interfere with, these reservations. The right of pre-emption granted by law to the settlers, of 640 acres each, including

their settlements, were also to be avoided. It seems to result necessarily from these provisions, that the commissioners must first determine what were the proper subjects of reservation, and having determined that a given salt lick or spring came within the provisions of the law, the power and duty of laying off by survey the 640 acres reserved, and to be avoided, around the lick, seems necessarily and irresistibly to result to the commissioners, in all cases where they might deem it necessary to do so, in order to enable them to lay off the lands for the officers and soldiers, so as to avoid these reservations. The adjacency of pre emption rights, too, might render it both necessary and proper that they, as well as the reservations, should be laid off, because both were to oe avoided. But more especially it was indispensable wherever the commissioners were about to lay off lands for the officers and soldiers, adjacent to a salt lick or spring, to hav a survey made of the reservation, to give it figure and fixed locality ; otherwise, the reservation being of quantity only, without boundary, one of two consequences must have resulted, namely, that it might, lawfully, be encroached upon on one side, and if on one, on any other side ; or that, practically, its uncertainty must have excluded a much larger quantity than was intended by law to be reserved from the satisfaction of the claims of the officers and soldiers.

In the construction of a doubtful and ambiguous law, the cotemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect. The law was not only thus construed by the commissioners, but that construction seems to have received, very shortly after, the sanction of the legislature. By the third section of an act passed by the legislature of North Carolina in 1789, entitled, " An act directing the sale of the salt licks and springs, with the adjoining land, within the District of Mero," it is enacted, that the commissioners appointed to carry that act into effect " shall cause to be surveyed, *where such surveys have not already been made,* all the said salt licks and springs, with the six hundred and forty acres of adjoining land."

This provision must be construed as recognising the validi-

ty of, and as ratifying the surveys which had been made by the commissioners under the act of 1782.

The circumstance of the survey containing a considerable surplus we think immaterial. It was a public act, done by a public authorized agent of the government, and afterwards recognised by the government itself. None but the government itself ought, therefore, to be permitted to call it in question.

It is argued, that, however this may be, the legislature, by the act of 1789, above recited, have declared the whole of the reservation, not otherwise appropriated to the Davison academy, the 200 acres vested in the town, and the land granted to John M'Nairy, to be vacant unappropriated land, subject to individual appropriation by entry, survey, and grant, in the ordinary mode; and that as the land granted to Darby is not embraced by either of these prior appropriations, his grant is valid.

We are not of that opinion. The second section of the act of 1789, directs the County Courts to make out lists " of all the salt licks and springs in their respective counties, which said Courts shall deem fit for the purpose of manufacturing salt, including all such licks and springs as were set apart by commissioners heretofore appointed for that purpose, as public property, viz. Heaton's lick, Denton's lick, the French lick, &c., which lists shall be entered on the records of said Courts, and copies thereof delivered to the commissioners appointed by this act; and all *other salt licks* and springs, with the adjoining lands, not deemed by the Court fit for the manufacturing of salt, be, and they are hereby declared vacant land, and liable to be located and entered in the same manner as other vacant land."

The act then proceeds to direct how the commissioners appointed by that act shall proceed to sell the salt licks and springs, with the adjoining lands, listed as deemed fit for manufacturing salt. From these provisions, it was obviously the intention of the legislature, that all the salt licks and springs deemed fit for the manufacturing of salt, with the adjoining lands to each, shall be sold in the manner specially directed by the act; and the French lick is, by the act itself, enumerated as one belonging to that class.

It was only those not deemed fit for the manufacture of salt, with the reserved lands adjoining them, that were declared vacant land, subject to be appropriated by location and entry. We can discover no other law of North Carolina, or of Tennessee, which subjects the reservation about any of the licks deemed fit for manufacturing salt, to appropriation by entry and survey, as vacant land.

We, therefore, accord in opinion with the Circuit Court, that the grant to Patrick H. Darby is void.

The Circuit Court, as appears by the bill of exceptions, permitted evidence to be given, for the purpose of showing the Court had no jurisdiction ; and instructed the jury, that if they believed the facts which this evidence conduced to prove, the Court had no jurisdiction over the cause. This was certainly irregular and improper. The jury were sworn to try the general issue, and the facts involved in it, not to try facts involved in a question of jurisdiction.

The instructions of the Court were calculated to lead and divert the attention of the jury, from the subjects of inquiry properly before them, to others in no way connected with the issue. For this error, the judgment of the Circuit Court must be reversed, the cause remanded to the Circuit Court, with directions to set aside the verdict, and for new proceedings to be had therein, not inconsistent with the judgment of this Court.