GUISEPPI et al. v. WALLING, Administrator of the Wage and Hour Division, United States Department of Labor.

MARETZO et al. v. SAME.

GEMSCO, Inc., et al. v. SAME.

Nos. 361–363.

Circuit Court of Appeals, Second Circuit.

June 27, 1944.

612

Douglas B. Maggs, Archibald Cox, and Louis Sherman, all of Washington, D. C., Irving Rozen, of New York City, and Kenneth Meiklejohn and Faye Blackburn, both of Washington, D. C., for respondent.

Landau & Friedman, of New York City (Solomon S. Friedman, of New York City, of counsel), for petitioners, Josephine Guiseppi et al.

Brower, Brill & Tompkins, of New York City (Ilo Orleans and Coleman Gangel, both of New York City, of counsel), for petitioners Mildred Maretzo et al.

Weisman, Quinn, Allan & Spett, of New York City (Samuel S. Allan and Seymour D. Altmark, both of New York City, of counsel), for petitioners Gemsco, Inc., et al.

Kraushaar & Kraushaar, of New York City (Meyer Kraushaar, of New York City, of counsel), for Lidz Brothers, Inc., amicus curiae.

Erwin Feldman, of New York City, for Harlem-Adler Co., Inc., and Schner-Block Company, amicus curiae.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Our starting point is this: Without the prohibition of home-work contained in the order of the Administrator the Act, in its application to this industry, will be unenforcible and will become virtually a dead letter. For so it was found as a fact by the Administrator, to whom the Act assigns its enforcement.[2] And the truth of his findings petitioners cannot here dispute, since they do not assert that those findings are not supported by substantial evidence heard at the Administrator's hearing. At most, some of the petitioners cite a part of the evidence which is at variance with the findings but make no effort to show that there was not other contrary evidence of a

substantial character. Moreover, as the printed supplements to their briefs, filed under our Rule 22, do not contain all the evidence, we must assume that, if we were to read all of it, the findings would be amply justified.[3] We must, too, take those findings "at their face value," although the Act did not require the Administrator to make them.[4] Indeed, assuming for the moment that, if necessary to make the statute effective, the Act conferred on him the power to issue such a regulation, there is a "presumption of the existence of facts justifying its * * * exercise."[5]

2. Notwithstanding that, on this record, petitioners are obliged to confess that the wage order will fail without the home work prohibition, they assert that the Administrator had no power to issue it. Faced with the provisions of § 8(f)—which authorize him to insert in wage orders issued pursuant to § 8 "such terms and conditions as" he "finds necessary to carry out the purposes of such orders, to prevent the circumvention * * *, and to safeguard minimum wage rates established therein"— petitioners say that, although on the facts here the elimination of home work is perhaps within that language, the regulation is so sweeping in its consequences that, had Congress intended to authorize it, the statute would have dealt with that subject specifically as it did with child labor in § 12. But in § 12 Congress dealt with child labor as an independent matter, completely eliminating the employment of minors in the affected industries because of the socially and economically undesirable character of such employment and without regard to the effect on the wage rates and hours of adults. Here the Administrator has prohibited home work not at all on the ground of its inherent undesirability but solely as a means of preventing the circumvention or evasion of an order prescribing adult wage rates. Moreover, doubtless having in mind the provision of § 8(b) that a wage order must "not substantially curtail employment in the industry," the

---

[2] See the last sentence of § 11(a) and § 17.

[3] Cf. Railroad Commission v. Pacific Gas & Electric Co., 302 U.S. 388, 392, 398, 401, 58 S.Ct. 334, 82 L.Ed. 319; Spiller v. Atchison, T. & S. F. Ry. Co., 253 U.S. 117, 125, 40 S.Ct. 466, 64 L.Ed. 810; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 54 S. Ct. 692, 78 L.Ed. 1260; Edward Hines

Trustees v. United States, 263 U.S. 143, 148, 44 S.Ct. 72, 68 L.Ed. 216.

[4] See Steuart & Bro., Inc., v. Bowles, 64 S.Ct. 1097, where the Court so held as to findings of the Price Administrator when acting pursuant to a statute which did not require findings.

[5] Pacific States Co. v. White, 296 U.S. 176, 186, 56 S.Ct. 159, 163, 80 L.Ed. 138, 101 A.L.R. 853.

Administrator has made a finding (which we must accept as true) that the home work regulation will have no such effect; the findings show that its consequences to the employers and employees is not as drastic as petitioners assert in their briefs. This is not a case, then, where an effort is being made to utilize § 8(f) as a subterfuge to achieve an independent end outside the scope of the Act; the regulation here is a means of accomplishing the purpose of an authorized wage order by stopping evasions of that order, and the Administrator in § 8(f) was expressly empowered to use means of that kind.[6] Nor, in view of the Administrator's findings, can it be said that this is a case where the means are so disproportionate to the authorized end that they cease to be means except in form and in truth become an independent end not contemplated in the Act.

Addison v. Holly Hill Fruit Products Co., Inc., 64 S.Ct. 1215, 1221, is not contrary to our conclusion. There the Court, interpreting one of the several specific exemptions from the Act, noted that those exemptions were "catalogued with particularity," and said: "Exemptions made in such detail preclude their enlargement by implication."

3. Petitioners, however, maintain that the amendment to the Act, in 1940, which added § 6(a)(5), with its specific reference to homework in Puerto Rico and the Virgin Islands, shows that Congress denied power elsewhere with respect to that subject. That argument cannot stand up; for the legislative history of § 6(a)(5) discloses that it was added to meet the peculiar economic conditions existing in Puerto Rico and the Virgin Islands; it might better be argued, indeed, that Congress found it necessary to amend the Act by adding that subsection precisely in order to limit the exercise of that power theretofore existing, before that amendment, with respect to those and all other areas covered by the Act.

4. Petitioners further contend that the legislative history of § 8(f) demonstrates that Congress did not intend thereby to delegate any authority concerning home-

work. That history, briefly told, is as follows: The Senate bill, as reported by the Committee in charge, provided that all minimum wage rates and wage differentials should be established by a Board through the issuance of labor standard orders. With respect to such orders the Board was given powers in a provision substantially the same as § 8(f) of the Act except that after the word "conditions" there was a parenthetical clause "(including the restriction or prohibition of such acts or practices)." On the floor, an amendment was adopted, without comment or objection, inserting in the parentheses the words "industrial homework." The original House bill, which was much the same as the Senate bill, included this same provision containing the matter in parentheses. This bill, however, was recommitted. The House Committee then reported a new bill which contained no provision for wage orders but established fixed minimum wages, and included no provision resembling § 8 (f), i. e., for the prevention of circumvention or evasion. This substitute bill (with modifications not relevant here) passed the House. In the Conference Committee a compromise was made between the Senate and House bills which resulted in the present Act, with § 6 containing fixed wage rates subject to acceleration as provided in § 8. Neither the Conference Report nor the subsequent debates discussed any reasons for omitting the matter in the parentheses from the provision which now appears as § 8(f). We see nothing in that ambiguous history disclosing an intention to eliminate from § 8(f) the power to prohibit home work if that prohibition is necessary to prevent circumvention or evasions.

Cudahy Packing Company v. Holland, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895, is not in point. True, there, the Court referred to the fact that authority to delegate the subpoena power, expressly granted in the Senate bill, had been rejected by the Conference Committee; but, as the Court pointed out, the significance of that fact was that the Conference Committee substituted a provision giving the Administrator the subpoena power conferred upon the

---

[6] Accordingly we see nothing in the suggestion that the regulation is invalid because the Administrator did not find that it would directly serve the declared policy of the Act set forth in § 2. It is enough that it will do so indirectly, i.

e., that it is a necessary adjunct to enforcement of the wage order authorized by the Act, which order, in turn, is issued to achieve the declared purpose contained in § 2.

Federal Trade Commission, and that agency, and other agencies upon which like power had been conferred, had never theretofore construed it to include the right to delegate the issuance of subpoenas; the Court also said that, if the right to delegate the subpoena power were implied, then necessarily there would be a similar implication as to all the functions assigned by the statute to the Administrator, a conclusion which the important nature of several of those functions precluded.

5. But petitioners assert that, even granting that § 8(f), taken alone, would include the power to issue the home work order, other provisions of the Act show that Congress could not have intended to authorize so extensive a regulation. The argument runs thus: § 8(f), by its terms, restricts the Administrator's authority to that of annexing "terms and conditions" to "orders" issued under § 8; no similar power is given him as to wage rates automatically established under § 6 when no § 8 order is operative; by § 8(e), all orders (except in unusual circumstances) expire in October, 1945. If, then, say petitioners, § 8(f) were construed to authorize the homework prohibition here, that prohibition would expire in 1945. It is unreasonable to believe, argue petitioners, that Congress intended that so extensive a prohibition should be in effect for a period of at most seven years (in this case a little more than a year), that home work could be banned during but a small span and not for the long future. Accordingly, petitioners urge, as § 8(f) applies only to orders, it must, for the sake of consistency, be construed not to include so extensive a power.

That argument proves too much. It cannot stop with eliminating from § 8(f) the authority to forbid home work. Pushed to its logical conclusion, this contention says that any regulation under that subsection lacks validity unless the statute expressly authorizes a similar regulation concerning all wage rates; petitioners would thus have us read § 8(f) out of the Act. As, of course, petitioners do not venture to go that far, their "consistency" contention comes to this: § 8(f) must be narrowly interpreted so as not to confer authority of any importance; in other words, the Administrator may make a regulation to prevent minor evasions of a wage order, but he is powerless to prevent major evasions which, as here, will gut the order. Such an interpretation—which flies in the face of the wording of § 8(f), rendering it virtually meaningless, making practically useless many a wage order, thus all but destroying § 8—ascribes to Congress an unreasonable intention.

Were it necessary for us here to pass on the matter, we would be obliged to consider whether consistency and reasonableness require that § 8(f) be interpreted so as to apply to all wage rates or whether, quite aside from § 8(f), the Administrator has the implied power to issue regulations necessary to protect all wage rates from evasions.[7] But the power of the Administrator to safeguard wage rates when no wage order is in effect is an issue not now before us. Since in the instant case there is such a wage order, it is not our present concern whether or not the act is deficient in its protection of wage rates not established by an order. If there is such a flaw, it is the function of Congress to deal with it. The legislative process is inherently such that, on occasions, the applications of a statute in practice disclose inconsistencies. While the literal meaning of a statute must yield to its evident purpose or policy, yet where a statutory provision accords with that purpose, the courts should seldom enlarge that provision, in the interest of symmetry or uniformity, in order to supply an omission.[8] In interpreting an-

---

[7] See, e. g., Edward's Lessee v. Darby, 12 Wheat. 206, 208, 6 L.Ed. 603; United States v. McDaniel, 7 Pet. 1, 14, 8 L.Ed. 527; Boske v. Commingore, 177 U.S. 459, 469, 470, 20 S.Ct. 701, 44 L.Ed. 846; Federal Trade Commission v. Western Meat Co., 272 U.S. 554, 555–559, 47 S.Ct. 175, 71 L.Ed. 405; Alaska S. S. Co. v. United States, 290 U.S. 256, 54 S. Ct. 159, 78 L.Ed. 302; Phelps-Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194–196, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; Morgenthau, Implied Regulatory Powers in Administrative Law, 23 Ia.L.Rev. 575 (1943); cf. Osborn v. Bank, 9 Wheat. 738, 865, 6 L.Ed. 204; Commercial Solvents Corp. v. Mellon, 51 App.D.C. 146, 277 F. 548, 550; Hepburn v. Griswold, 8 Wall. 603, 613, 19 L.Ed. 513.

[8] See, e. g., McFeely v. Commissioner, 296 U.S. 102, 111, 56 S.Ct. 54, 80 L.Ed. 83, 101 A.L.R. 304; United States v. Union Pacific R. Co., 91 U.S. 72, 85, 23 L.Ed. 224; L. Hand, J., in New York Life Ins. Co. v. Bowers, 2 Cir., 39 F.2d 556, 559, affirmed 283 U.S. 242, 51 S.Ct. 399, 75 L.Ed. 1005.

other section of this very Act, the Supreme Court said the other day: "Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive."[9] If, then, it were true that, in working out the compromise between the House and Senate bills, Congress, by literally restricting the provisions of § 8(f) to orders, inconsistently left other wage rates subject to evasion, that would be no reason for holding that, as to orders, Congress did not mean what it said.

6. We cannot agree with the suggestion that Congress, if it had intended the Administrator to regulate home work, would have required him first to consult the industry committees or to hold hearings. For §§ 7(c) and 13 empower him to take action having more extensive consequences without such consultation or hearings.

We also consider untenable the suggestion that the home work regulation is invalid because the statute did not expressly require a hearing as a condition precedent to its issuance. Aside from the fact that here such a hearing was in fact held, the short answer is that the Constitution does not require a hearing before the promulgation of such a regulation. Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641; Phillips v. Commissioner, 283 U.S. 589, 596, 597, 51 S.Ct. 608, 75 L.Ed. 1289; Bi-Metallic Investment Co. v. State Board, 239 U. S. 441, 36 S.Ct. 141, 60 L.Ed. 372.[10]

7. We reject the argument that stricter enforcement or some other measure would meet the problem without the need for prohibiting home work, for the Administrator has made express findings to the contrary.[11]

8. Nor is there, we think, anything to the point that the Administrator has made an unreasonable discriminatory classification by his exemptions from the prohibition. The Fifth Amendment contains no "equal protection" clause.[12] Moreover, it is by no means clear that the exemption would be an invalid classification even under the Fourteenth Amendment.[13]

9. Equally unsound is the argument that the prohibition of home work violates due process. It is perhaps sufficient to note that, to support this argument, petitioners rely heavily on the remarks of Field, J., concerning liberty of contract in his concurring opinion in Butchers Union Co. v. Crescent City Co., 111 U.S. 746, 757, 4 S. Ct. 652, 28 L.Ed. 585. Surely the extreme views there expressed are no longer authoritative.[14]

10. Finally we come to the contention that, if the statute confers the asserted authority on the Administrator, then it unconstitutionally delegates legislative power. The question raised by that contention is not new. More than two thousand years ago, a profound student of government, from whom we derive the concept of a "government of laws, and not of men."[15] explained the inescapability of some delegation by legislators. The "rule of law," he said, "is preferable to that of any indi-

---

9 Addison v. Holly Products, Inc., 64 S.Ct. 1215, 1221.

10 When, pursuant to statute, courts make rules governing practice and procedure, they are not required, as condition precedent, to hold hearings. The question of the validity of those rules can be raised in specific cases arising under them.

11 The contention of Gemsco, et al. (made half-heartedly before us) that manufacturers of military and naval insignia should not have been (or are not), included in the definition of this industry, is met by the Administrator's contrary findings.

12 Cf. Helvering v. Lerner Stores, 314 U.S. 463, 468, 62 S.Ct. 341, 86 L.Ed. 343.

13 Cf. Queensboro Farms v. Wickard, 2 Cir., 137 F.2d 969, 977, 978.

14 See, e. g., United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L. Ed. 609, 132 A.L.R. 1430; Jones & Laughlin, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Phelps Dodge Corp. v. Labor Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A. L.R. 1217; Olsen v. Nebraska, 313 U. S. 236, 61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330; cf. Hume v. Moore-McCormack Lines, 2 Cir., 121 F. 2d 336, 339, 340.

15 That phrase came into English thinking about government through Harrington's Oceana (1656) 2–29; Harrington there acknowledged borrowing it from Aristotle. John Adams, in turn, borrowing the phrase from Harrington who much influenced him, wrote it into the Bill of Rights of the Massachusetts Constitution of 1780.

vidual" and "he who bids the law rule may be deemed to bid God and Reason alone rule, but he who bids man rule adds an element of the beast; for desire is a wild beast, and passion perverts the minds of rulers, even when they are the best of men," whereas "the law is reason unaffected by desire." But, sagely, he noted that "there may indeed be cases in which the law seems unable to determine," and asked "but in such cases can a man?" He answered that "the law trains officers for this express purpose, and appoints them to determine matters which are left undecided by it, to the best of their judgment. Further it permits them to make any amendment of the existing laws which experience suggests * * * And at this day there are magistrates, for example judges, who have authority to decide matters which the law is unable to determine * * *" He added that "no one doubts that the law would command and decide in the best manner whenever it could. But some things can, and others cannot, be comprehended under the law, and this is the origin of the vexed question whether the best law or the best man should rule. For matters of detail about which men deliberate cannot be included in legislation. Nor does anyone deny that the decisions of such matters must be left to man * * *" [15a]

Without mentioning that author, our Supreme Court has often echoed his words. In 1904, it said,[16] "Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted." In 1934, it said, "Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national Legislature cannot deal directly.

[15a] Aristotle, Politics, Bk. III, Ch. 16, 1287a, 24 et seq. He also spoke of "filling up the gaps which the law is obliged to leave."

And in his remarks elsewhere on "equity," he said that "all law is couched in general terms, but there are some cases upon which it is impossible to pronounce correctly in general terms. Accordingly, where a general statement is necessary, but such a statement cannot be correct, the law embraces the majority of cases, although it does not ignore the element of error. Nor is it the less correct on this account; for the error lies not in the law, nor in the legislature, but in the nature of the case. For it is plainly impossible to pronounce with complete accuracy upon such a subject matter as human action. Wherever then the terms of the law are general, but the particular case is an exception to the general law, it is right, where the legislator's rule is inadequate or erroneous in virtue of its generality, to rectify the defect which the legislator himself, if he were present, and had he known it, would have rectified in legislating * * * This is in fact the nature of the equitable; it is rectification of law where it fails through generality * * * For where the thing to be measured is indefinite the rule must be indefinite * * *" Nicomachean Ethics, Bk. V, Ch. 10, 1137b, 13-31. "The equitable seems to be just and equity is a kind of justice, but goes beyond the written law. This margin is left by legisla-tors, sometimes voluntarily, sometimes involuntary; involuntarily when the point escapes notice, voluntarily when they are unable to lay down a definition, and yet it is necessary to lay down an absolute rule; also in cases where inexperience makes it hard to define * * *; for life would not be long enough for a person to enumerate the cases." Rhetoric, Bk. I, Ch. 13.

By a "government of men" Aristotle apparently meant a government in which a specific judgment or decree affecting a specific person is rendered by the legislator or legislative body. Curiously, some of our Congressional "private bill" legislation would come within that criticized category.

Aristotle's point of view reappeared in a New York Times' editorial of December 15, 1943: "It is the proper function of Congress to frame laws and general policies, to delegate powers wherever detailed control is necessary, and to see that laws are properly administered. But it is not the function of Congress itself to administer the law. It is not its business to meddle in specific decisions. Once it does so * * * it will find itself overwhelmed with administrative details that it is not remotely organized to attend to * * * Such detailed meddling can only * * * lead towards administrative chaos."

[16] Buttfield v. Stranahan, 192 U.S. 470, 496, 24 S.Ct. 349, 355, 48 L.Ed. 525.

The Constitution has never been regarded as denying to the Congress necessary resources of flexibility and practicability * * *. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility." [17]

True, in the case last quoted and in another decided about the same time,[18] it was held that the delegations there involved were so lacking in adequate standards, so unrestrained, as to be unconstitutional. But, in the light of many subsequent decisions, those two cases must now be con-

sidered exceptional, restricted to their particular or very similar facts. The standard in § 8(f), coupled with the provisions of the other provisions of § 8 and with § 2, amply meet the test of adequacy of standards according to recent Supreme Court decisions.[19]

Petitioners scarcely try to distinguish those cases. They fall back on a rigid conception of the "separation of powers" doctrine. Such an inflexible conception finds no justification in English or American history,[20] and cannot be realized in practice.[21] As Holmes, J., said in his dissenting opinion in Springer v. Philippine Islands,

[17] Panama Refining Co. v. Ryan, 293 U. S. 388, 421, 55 S.Ct. 241, 248, 79 L.Ed. 446.

[18] Schechter Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947.

[19] See, e. g., Opp Cotton Mills v. Administrator, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S. Ct. 907, 84 L.Ed. 1263; Yackus v. United States, 321 U.S. 414, 64 S.Ct. 660; Bowles v. Willingham, 321 U.S. 503, 64 S. Ct. 641.

[20] See Holdsworth, 10 History of English Law, 720, for the grave inaccuracy of Montesquieu's description of the English government of the 18th century as one in which the three functions were clearly separated. "It is curious that some political theorists should have seen their favorite ideal, a complete separation of administration from judicature, realized in England; in England of all places in the world, where the two have for ages been inextricably blended". Maitland, 3 Collected Papers (1911) 478; cf. Holmes, Collected Legal Papers (1920) 251, 263. That Montesquieu's idea as to the judicial function was apparently not that adopted in his own country, see Franklin, The Judiciary State, 2 Nat. Lawyers' Guild Q. (1940) 244, 249–250; cf. Franklin, The Passing of The School of Montesquieu, 12 Tulane L.Rev. 1 (1937). For "the conviction that the courts should not interfere with administrative action became the basic postulate of the French version of the separation of powers * * *"; Seagle, The Quest for Law (1941) 331.

Incorrect also is the notion that Coke, in the 17th century, espoused the "separation" doctrine. His attacks on the High Commission, an ecclesiastical court, and on other governmental agencies, were based on his contention that they

were exercising powers not conferred on them by Parliament, never that Parliament could not do so or that there was anything inherently bad in a grant of combined judicial and executive or legislative functions. He sat in both the Privy Council and the Star Chamber which each exercised combined judicial and administrative powers of an extensive character. Not only did he not protest against that fusion of powers in those bodies but late in life described the Star Chamber as "the most honorable court (our Parliament excepted) that exists in the Christian world." 4 Institutes 65.

In this country, the Articles of Confederation made no provision for separating the three powers. And the discussions of Madison and Hamilton in The Federalist (Nos. 38, 47, 48 and 66) show not only that the constitutions of most American States after Independence by no means adhered rigidly to the tripartite separation but also that the federal Constitution was not intended to do so. See also, Nettels, The Roots of American Civilization (1938) 666; Merriam, American Political Theories (1903) Chapters II and III.

Jefferson came to have a poor opinion of Montesquieu. And in 1816 he said of the Virginia country courts, which performed such nonjudicial functions as supervising schools, levying taxes and appointing sheriffs, "I acknowledge the value of this institution; it is in truth our principal executive and judiciary." 5 Works (Washington ed., 1853) 539; 7, ibid, 18.

[21] Cf. Story, The Constitution (1833) Chapter VII.

The Supreme Court, as early as 1825, held that Congress may delegate to the Supreme Court a power which the Court regarded as "legislative", i. e., the power to make or alter rules of procedure. Wayman v. Southard, 10 Wheat. 1, 6 L. Ed. 253.

618

277 U.S. 189, 211, 48 S.Ct. 480, 485, 72 L. Ed. 404: "It does not seem to need argument to show that however we may disguise it by veiling words we do not and cannot carry out the distinction between legislative and executive action with mathematical precision and divide the branches into watertight compartments, were it ever so desirable to do so, which I am far from believing that it is, or that the Constitution requires." [22]

As, in spite of Supreme Court decisions which should put the matter at rest, we still frequently hear arguments which assume an inherent infirmity in delegation of rule-making to administrative officers, it seems worthwhile to analyze the problem somewhat more in detail.

In the history of this country, subordinate legislative powers were delegated at an early day, both by our state legislatures and Congress.[23] What is new for us is the name "administrative law." [24] The writings of Goodnow and Freund introduced that name to the American legal profession several decades ago. But only in recent years has it come into extensive use. Even now, it finds no place in many of our conventional "digests." A new name, a novel label expressive of a new generalization, can have immense consequences. Emerson said, "Generalization is always a new influx of the divinity into the mind. Hence the thrill that attends it." [25] Confronted with disturbing variety, we often feel a tension from which a generalization, an abstraction, relieves us. It serves as a de-problemizer, aiding us to pass from an unstable, problematical, situation to a more stable one. It satisfies a craving, meets what Emerson called "the insatiable demand of harmony in man," a demand which translates itself into the so-called "law" of "the least effort." [26] But the solution of a problem through the invention of a new generalization is no final solution: The new generalization breeds new problems. Stressing a newly perceived likeness be-

[22] About a half century ago, William Bondy (now Judge Bondy) in his brilliant work, Separation of Governmental Powers, 5 Columbia Studies in History, Economics and Public Law, No. 2 (1896), illuminated this subject. He showed that the specific allocations of functions in the Constitution were determined by practical rather than theoretical considerations. He calls "administrative" any powers not explicitly allocated, although in their nature legislative, executive or judicial. Such powers, he suggests, Congress may itself exercise or, by statute, assign either to the executive or judicial branches or to "administrative" officials. All that the "separation" doctrine means, he says, is this: If the Constitution expressly assigns a power to any one branch, the others may not interfere with its proper exercise; the courts, however, may, in a "case or controversy," determine whether a power has been properly exercised (except as to certain "political" matters and as to the exercise of certain powers by the Chief Executive.)

[23] In 1787, the Vermont legislature assigned to the officials of the several towns of that state the task of granting rights to operate ferries and of regulating the grantees' "prices" and "profits," (such regulations "to be varied from time to time as occasion shall require") because, so the legislation said, "it has been found by experience that great advantage has been taken by ferrymen demanding unreasonable prices for their services" and "this Assembly cannot so well distin-

guish between the several rivers, and the several parts of said river, or lake, on account of distance, swiftness of water, number of travellers, etc." The state insurance departments are, we are told, "institutions with nearly a century of growth"; the state insurance commissioner "is partly executive, partly judicial and partly legislative"; no one can tell "when he stops legislating and begins to judge, or where he stops judging and begins to execute." Patterson, The Insurance Commissioner in the United States (1925) 5. In the federal government, administrative agencies dealing with the customs and with veterans were created in 1789, and the Patent Office had its start in 1790; eleven of the now-existing agencies had their beginnings between 1789 and the close of the Civil War; from 1865 to the end of the 19th century, six of the present boards were established; nine more date from the period 1900–1918; and another nine from the period 1918–1929. See Report of the Attorney General Committee on Administrative Procedure (1941) 6–10.

[24] Patterson, loc. cit., 4.

One recalls Molière's M. Jourdain who learned with pleasure, that, like literary men, he had been talking prose all his life.

[25] Emerson, Circles.

[26] Cf. Demogue, Analysis of Fundamental Notions, in Modern French Legal Philosophy (transl. 1916) 471; Kallen, Art and Freedom (1942) II, 708–710.

tween many particular happenings which had theretofore seemed unlike, it may blind us to continuing unlikenesses. Hypnotized by a label which emphasizes identities, we may be led to ignore differences. In all fields of thought this evil is encountered. Nowhere can it do more harm than in democratic government—and in democratic courthouse government in particular. For, with its stress on uniformity, an abstraction or generalization tends to become totalitarian in its attitude towards uniquenesses.[27] While, then, the concept of "administrative law" is invaluable, because it pulls together, for comparative study and common use, techniques and ideas developed in scattered areas of administrative action,[28] there is danger that that concept may yield inelastic uniformities. All administrators should not be treated identically.[29] Yet the problem of the delegated powers of a particular administrative of-

[27] If there is "an insatiable demand of harmony in man," there is also an insatiable human delight in individualities (particularities) which defy uniformity. We should revise Gilbert and say, That every boy and every gal, That's born into the world alive, Is *both* a little Liberal, And a little Conservative. The proportions vary in different persons and in the same person at different times.

[28] Thus the new administrative service of Pike & Fischer has already induced the divers administrative agencies to borrow from one another. The Secretary of Agriculture, for instance, recently cited an S. E. C. opinion concerning fairness in the interpretation of an administrative regulation; see In re Middletown Milk & Cream Co., Inc., 3 A.D. 84, referring to Matter of Consumers' Power Co., 6 S.E.C. 444.

[29] "The problems subsumed by 'judicial review' or 'administrative discretion' must be dealt with organically; they must be related to the implications of the particular interests that invoke a 'judicial review' or as to which 'administrative discretion' is exercised. Therefore, a subject like 'judicial review,' in any scientific development of administrative law must be studied not only horizontally but vertically, e. g., 'judicial review' of Federal Trade Commission orders, 'judicial review' of postal fraud orders, 'judicial review' of deportation warrants. For judicial review in postal cases, for instance, is colored by the whole structure of which it forms a part, just as in land office cases, or in immigration cases, or in utility valuations, or in insurance license revocations, it derives significance from the nature of the subject matter under review as well as from the agency which is reviewed." Frankfurter, Introduction to Patterson, loc. cit. xvi–xvii.

As Patterson says (loc. cit. 4–5), "one cannot assume * * * that the same code of procedure which works well in workmen's compensation will do for the regulation of insurance enterprises. As well apply the violent methods of military law to the taking of a census!"

Dean Landis in 1938 referred to "the insistence of Mr. Justice Brandeis that differences in treatment should be accorded to findings of fact by different administrative officials, because of differences in the facts and in the qualities of the administrative to be expert in finding the facts." He also said: "If the extent of judicial review is being shaped, as I believe, by reference to an appreciation of the qualities of expertness for decision that the administrative may possess, important consequences follow. The constitution of the administrative and the procedure employed by it become of great importance. That these factors already in part mold the scope of judicial review is apparent from the decisions. Different agencies receive different treatment from the courts. A reputation for fairness and thoroughness that attaches to a particular agency seeps through to the judges and affects them in their treatment of its decisions." Landis, The Administrative Process (1938) 143–144, 153.

Previously, Henderson, in The Federal Trade Commission (1924) 337, had said: "The expert judgment of the Interstate Commerce Commissions is, as I have said, respected by the courts, and the only reason I can think of for not giving the same treatment to the findings of the Federal Trade Commission is that it is difficult to tell from the great majority of the findings that the Commission has ever exercised an expert judgment, since the reasons for the decision are never given. Despite the dicta of the Supreme Court, I venture the opinion that the matter is not yet foreclosed, and that if it should appear in some future case that the Commission has based its decision on an expert judgment of a practical nature, the court is still in a position to state that it will not substitute its own judgment for the judgment of the Commission. So long as the Commission adheres to its present formal findings of fact, however, there can be little hope of such an outcome."

Recently the Supreme Court has shown signs of employing such an empirical, selective, test in its dealings with the sev-

ficer is illuminated by the recognition that it is part of a general problem common to what Patterson refers to as the "pluralistic universe of administrative law." The illumination, however, has brought fear to some. The very word "delegation," when now coupled with the words "administrative officers," strikes terror in their hearts. They resemble the child who was horrified when his attention was called to the facts that his tongue was wet and his shoes full of feet. For delegation is a name for something that has always been present in society and always will be.[30] Perhaps the fright the label engenders can be reduced by observing that "discretion," which is familiar, is kin to "delegation." Almost boundless discretion has traditionally been conferred upon state and federal prosecuting officers to begin or not to begin proceedings of enforcement of some of the huge number of penal statutes (and against some rather than against other violators) and to "settle" such cases by "bargain day" methods.[31] Wide, too, is the beneficent discretion of courts sitting in equity to relax stiff legal rules.[32] And the power of courts in general to interpret statutes has been said by some persons to be, in practical effect, a sort of supplementary legislation which the legislature necessarily leaves to the courts.

Indeed, those who today criticize the transfer of "subsidiary legislation" to administrative officers forget that, inspired by somewhat similar motives, there has been and still is much criticism of the power exercised by judges in construing statutes, that Bentham, Livingston, and their disciples (some even in our time[33]) have insisted that all "law" must emanate solely from the legislature, and have tried, through codification, to destroy all "judicial legislation."[34] Repeated attempts on the European continent to exploit that notion have invariably proved disappointing.[35] Legal certainty to be attained by eliminating, via codification, all judicial law making is a fatuous dream.[36] Courts in their interpretation of statutes often

---

eral administrative agencies. Thus in Dobson v. Commissioner, 320 U.S. 489, 498, 64 S.Ct. 239, 245, when announcing the extensive authority of the Tax Court in matters of "fact," the Court said: "It has established a tradition of freedom from bias and pressures." See, on the other hand, the increased strictness of the Court's attitude towards another agency in Eastern-Central Ass'n v. United States, 321 U.S. 194, 64 S.Ct. 499.

[30] Consider, for instance, the powers delegated to cities and counties to enact ordinances; to private corporations to enact "by-laws" affecting their stockholders and persons dealing with them; and to public utility corporations to make regulations affecting thousands of consumers. Cf. Allen, Law In The Making (1927) Ch. XII.

[31] Cf. Wallace, Nullification: A Process of Government, 45 Pol.Sc.Q. (1930) 347.

In 1941, in hearings on S.674, S.675 and S.918, Senator O'Mahoney said to a witness: "Now the question as to whether or not there shall be a complete separation of prosecution and adjudication in all of these matters, and your position that they cannot possibly be joined in the same person without great detriment, prompts me to suggest, because of your statement a moment ago, that in the ordinary criminal procedure, day after day, prosecuting attorneys are confronted with the problem of determining whether or not they shall proceed with a particular case, and whether or not a particular type of settlement will be made. Prosecuting attorneys, U. S. attorneys, attorneys in the various districts, county attorneys, State attorneys and the like are constantly making these decisions which come within the border line * * * ".

"In the Illinois Crime Survey of some dozen years ago, it was found that in a given year 13,117 felony prosecutions were begun in Chicago. Only 498—less than one in twenty-six—ever came to trial." Puttkammer, Criminal Law Enforcement, University of Chicago Law School, Reprint and Pamphlet Series (1941) No. 1, p. 6.

[32] The hostility of the common law lawyers and judges to such discretion has often been compared with current hostile attitudes towards administrative agencies.

[33] Cf. Franklin, The Judiciary State, 3 Natl. Lawyers Guild Q. (1941) 26.

[34] See, e. g., the remarks of Edward Livingston and his colleagues in their preliminary report, in 1823, on the Louisiana Civil Code, Louisiana Legal Archives, Vol. I, A Republican of the Projet of the Civil Code of Louisiana of 1825 (1937) xvii–xviii.

[35] See, e. g., Seagle, The Quest For Law (1941) Chapter XVIII.

[36] The notion of a "Ministry of Justice" or Law Revision Committee is another matter. See Stone and Pettee, Revision of Private Law, 54 Harv.L.Rev. (1940) 221.

cannot avoid some such legislation. The enactment of many a statute thus, by implication, calls on the courts to engage in supplemental law making. That activity should always, of course, be modest in scope.[37] But the necessary generality in the wording of many statutes, and ineptness in the drafting of others, frequently compels the courts, as best they can, to fill in the gaps, an activity which, no matter how one may label it, is in part legislative.[38] Sagacious legal scholars of high repute, such as, for instance, John Chipman Gray, Wigmore, Allen and Radin, have said that courts, in discharging their duty of carrying out the express will of the legislature as faithfully as they can, are frequently unable to escape the responsibility of engaging in supplemental legislation.[39] As Chief Justice Hughes said in 1928, "a federal statute finally means what the [Supreme] Court says it means." [40] Thus the courts in their way, as administrators in their way, perform the task of supplementing statutes. In the case of the courts, we call it "interpretation," or "filling in the gaps"; in the case of administrators we call it "delegation" of au-

[37] Com'r v. Beck's Estate, 2 Cir., 129 F.2d 243, 245, 246; New England Coal & Coke Co. v. Rutland R. Co., 2 Cir., 143 F.2d 179.

[38] The remark of Bishop Hoadly, usually quoted in discussions of judicial legislation—"Nay, whoever hath an absolute authority to interpret any written or spoken laws, it is he who is truly the Law Giver to all intents and purposes, and not the persons who first spoke and wrote them"—has been given a specific application to statutory interpretation. That judicial legislation is an inherent part of the work of the courts in the development of legal rules when no statutes are involved has been avowed by at least eight Supreme Court Justices— Holmes, Hughes, Brandeis, Stone, Cardozo, Frankfurter, Douglas and Jackson; see citations in New England Coal & Coke Co. v. Rutland R. Co., 2 Cir., 143 F.2d 179, note 31.

Many learned commentators have said the same; see, e. g., the citations in Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, 245, note 3; Waite, Judge-Made Law And The Education of Lawyers, 30 Am. Bar. Ass'n J. (1944) 253.

There has, however, been greater reluctance to admit that, similarly, interpretation of statutes often requires such legislation. Yet it is difficult to justify a differentiation. Several students of continental legal systems have recognized that statutory construction often necessitates judge-made law. See Kiss, Equity and Law, in The Science of Legal Method (transl. 1917) 146; Lambert, Codified and Case Law, in the same volume, 251; Wurzel, Juridical Thinking (in the same volume), 286; Alvarez, Methods For Codes (in the same volume) 429. As Mr. Justice Jackson recently noted, the Swiss Code candidly calls for such law-making by the judges; State Tax Commission v. Aldrich, 316 U.S. 174, 202, note 23, 62 S.Ct. 1008, 86 L.Ed. 1358, 139 A.L.R. 1436.

Paul, Federal Estate and Gift Taxation (1942) I, 43–44, 62, 86–87, has observed that narrow or liberal construction of statutes often involves judicial legislation; cf. Jackson, The Struggle For Judicial Supremacy (1941) 58.

Seagle suggests that legislation actually leads to an increase of legislative activity by the courts. Seagle, The Quest For Law (1941) 298; cf. 196. See also Calhoun, Introduction to Greek Legal Science (1944) Ch. IV.

[39] In The Nature and Sources of Law (2d ed. 1921) § 370, Gray said "Interpretation is generally spoken of as if its function was to discover what the meaning of the legislature really was. But when the legislature has had a real intention, one way or another on a point, it is not once in a hundred times that any doubt arises as to what its intention was. If that were all that the judge had to do with the statute, interpretation of the statutes, instead of being one of the most difficult of a judge's duties, would be extremely easy. The fact is that the difficulties of so-called interpretation arise when the legislature has had no meaning at all; when the question which is raised on the statute never occurred to it; when what the judges have to do is, not to determine what the legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind had the point been present." He also said that "when the judges are professing to declare what the legislature meant, they are in truth themselves legislating to fill up" the gaps.

See Wigmore, The Judicial Function, in The Science of Legal Method (1917) xxvi; Allen, Law in The Making (1927) 283, 286–287; Radin, The Law and Mr. Smith (1938) Chapter XIV.

[40] Hughes, The Supreme Court of the United States (1928) 230.

thority to "supply the details." In both instances, the task is unavoidable.

There are those who, while they grudgingly concede the necessity of delegation of subordinate legislative powers to administrative officers, are disturbed because currently it is accompanied by what they consider an unwise breadth of authority in fact-finding given to such officers when deciding particular cases arising under administrative regulations.[40a] Such persons urge the courts to set narrow limits to the extent to which legislative powers may validly ·be assigned to administrators. But authority to find the facts is inseparable from the decision of specific cases.[40b] Judges trying nonjury cases have at least an equal breadth of authority in fact-finding. And extensive indeed it is, since, in the process of decision-making, the "minor" (fact) premise often plays a part as important as (if not more important than) the "major" (rule) premise.[41] (Recognizing that, where the testimony is in conflict, the determination of the facts by a trial judge involves a guess as to the accuracy and honesty of the witnesses, some commentators have, indeed, referred to the "discretion of the judge" in the "estimation of the testimony." [42]) Appellate courts sometimes make greater demands of administrators as to precision and detail in fact-finding than they ordinarily do of trial judges sitting without a jury [43]—although it is an open secret that some federal trial judges who resent their own obligation in nonjury cases to make findings of fact express antipathy to the fact-finding powers vested in administrative officials. And upper courts always require far more of administrators than they do of juries: few administrators are permitted to return general (factless) verdicts.[44] The suggestion that appellate courts should, when reviewing administrative action, inquire more searchingly into the findings of administrators than they now do under the "substantial evidence" rule· is difficult to reconcile with the practice of those courts in reviewing decisions of trial courts; moreover it would burden appellate courts impossibly unless the number of appellate judges were increased at least tenfold.[45] The truth is that much of the regulation of the affairs of citizens which the complexities of our civilization necessitates calls for a very considerable use of the administrative device,[46] and that its use must be accompanied by grants of delegated powers [47] both as to the making of rules and the finding of facts. Complexity is our lot and we should not rail against its inevitable concomitants.[48] Improvement in the procedures of administrative agencies and in their relations to the courts, when they judicially review administrative conduct, is desirable and pos-

---

[40a] Cf. Chief Justice Hughes, Address before Federal Bar Ass'n, quoted in N. Y. Times, February 13, 1931, p. 18; Bell, Let Me Find The Facts, 26 Am.Bar. Ass'n J. (1940) 552. See United States v. Forness, 2 Cir., 125 F.2d 928, 942.

[40b] It should be noted, too, that the courts which issue rules of procedure, subsequently apply them when particular cases arise involving those rules. And the effect of such rules is no light matter: failure to comply with them has cost many a man his life, liberty or property.

[41] "The major," said Burke, "makes a pompous figure in the battle, but the victory depends upon the little minor of circumstance."

[42] Such comments have been made concerning the position of the trial judge under modern trial procedure as contrasted with the previous continental procedure when proof was regarded quantitatively and qualitatively in accordance with fixed rules as to the age, sex and social position of the witnesses. See Millar, in Englemann, History of Continental Civil Procedure (transl. 1927) 41–49.

[43] Cf. dissenting opinion in Eastern Central Ass'n v. United States, 321 U.S. 194, 215, 64 S.Ct. 499, 508.

[44] Some federal trial judges recently expressed indignation when it was suggested that the proposed rules of procedure in criminal cases should provide for fact-finding by a judge when trying a criminal case without a jury.

[45] Cf. Benjamin, Administrative Adjudication in The State of New York (1942) 336–338.

[46] By that device, advantages are gained which are not procurable by the judicial process, including inter alia, preventive action and decisions which citizens can procure in advance of action.

[47] See 257 U.S. xxv–xxvi; Hughes, Some Aspects of Development of American Law, 39 N.Y. State Bar Ass'n Report (1916) 266, 269; Root, Addresses on Citizenship and Government (1916) 534.

[48] As Puttkammer says (loc. cit. 9), "we have altogether too much of a tendency to try to correct the abuse of administrative discretion by abolishing the discretion."

sible.[49] The phrases "separation of powers" and "a government of laws, and not of men," if properly construed, embody principles of the first importance in a democracy; but if so construed as seriously to cripple effective government, they will lead to democracy's downfall, for, as the Federalist tells us, an ineffective government paves the way to anarchy and thence to depotism.[50] Laws neither execute nor interpret themselves. Men must discharge those functions. Above all what we need is the selection of well-trained, honest, able men, conscientiously obeying the laws, and imbued with the spirit of democracy, to serve as administrators and on the bench.[51]

Their selection, however, is not a judicial function. And it is surely not our function in this case to thwart the legislative purpose (whether we like it or not) by so interpreting this statute as to leave it, as to the industry here concerned, a mere bit of worthless printing.

Petitions denied.

L. HAND, Circuit Judge (concurring).

The only question which, as I view it, requires discussion is the meaning of § 8 (f); for the plaintiffs' objections, based upon the Fifth Amendment, and—as applied to this situation—upon a supposed unlawful delegation of power, have long since been answered in the books. I should have not had any trouble as to § 8(f), had it applied to all wages—those fixed by statute as well as those fixed by "advisory committees"—indeed, I am not sure that the Administrator would have needed any express grant of power to promulgate the regulation which he did, had the Act been silent. His duty might have included preventing evasions and safe-guarding the rates in any event. But, since the power is in terms limited to what I may call "committee," as opposed to "statutory," wages, I have had some doubts whether we should construe it to comprise so drastic an exercise as is here in question. Indeed, unless it can be read to cover "statutory" wages, I do not believe that it would justify the proscription of a substantial part of the entire industry; for in that event the purpose we should have to ascribe to Congress would be nothing short of absurd. The regulation was promulgated in August, 1943, and at most could cover less than two years, except for the possibility—remote in this industry—that an "advisory committee" might thereafter reduce wages below 40 cents under § 8(e). And yet the regulation will disorganize and make over the industry, break up much family economy, and produce conditions which cannot possibly adjust themselves until after it has itself ceased to exist, when by hypothesis all will be free to go back to homework. Not only does every consideration which can support so heroic a remedy apply equally to "statutory" wages, but their exclusion so mutilates the only purpose that could have actuated the regulation, as to leave no intelligible purpose at all.

Even so, I should have had the utmost

---

[49] Some of the expansion of administrative activities probably has resulted from backwardness in improving the fact-finding techniques of the courts. The success of the advisory role played by the S. E. C. in Chapter X cases under the Chandler Act, 11 U.S.C.A. § 501 et seq., suggests that, in other contexts, administrative agencies could be used to better judicial fact-finding without departing substantially from judicial traditions. See New England Coal & Coke Co. v. Rutland R. Co., 2 Cir., 143 F.2d 179 note 30.

[50] The Federalist (Earle's ed. 1937) No. 70, p. 454; cf. No. 68, p. 444, and No. 51, p. 337.

[51] "To say that the quality of the people that administer your laws is unimportant, is, to my mind, ridiculous. The heart of the administrative problem is to get good administrators, or in the judicial problem, to get good judges. Now, there are certain laws that we must have to try to mitigate the effect of having bad men, either as judges or administrators * * * If part of the furor that is aroused about these bills [to establish rules for administrative procedure] could be devoted to efforts to assure good appointments, I think we all would be better off." Senator O'Mahoney, loc. cit.

John Foster Dulles, in the same hearings, said that when he had publicly stated that the administration of any law depended in the last analysis upon the character of the men charged with the duty of administering it, he had been severely criticized "on the ground that that demonstrated I was a Nazi because I believed in a government by men and not a government of laws, and the American system was a government of laws and not of men."

Cf. Lindsay Rogers, The Independent Regulatory Commissions, 52 Pol. Sc. Q. (1937) 1, 9–10.

compunction in disregarding the explicit language with which the section begins, were it not for its legislative history. The grant of power appeared in the Senate bill in its present form, where it was part of an entirely different plan: a Board was to fix all labor standards. There were amendments in the Senate which I shall come back to in a moment; but, when the bill reached the House, the whole scheme was scrapped, and wages were fixed by statute. I do not understand that in that phase, any power was given to the Administrator to protect the rates against evasion or to safeguard them; reliance being, perhaps, on his implied powers. In Conference a compromise was arranged, and a hybrid resulted; statutory rates were kept, but the Administrator had no power over them except a veto, and "advisory committees" were to fix them within prescribed limits. It was into this new plan, and into § 8, which set it up, that the power, as originally granted to the Administrator in the Senate, was reintroduced. Having had its origin in a plan which allowed wages to be fixed ad hoc, it took its place in that part of the act which still allowed them to be so fixed, though within limits. It was entirely natural that, when so introduced, the power should be thought of as limited to "committee" wages, forgetting its capricious and egregious incidence, if that were done. It does not therefore seem to me an undue liberty to give the section as a whole the meaning it must have had, in spite of the clause with which it begins. Such treatment of a statute needs no apology today, whatever were the scruples of the past. There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis; and I certainly do not wish to add to the barrels of ink that have been spent in logging the route. As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final.

I have not mentioned the parenthesis, which was interpolated into what has now become § 8(f) while it was in the Senate, and which was deleted when it was restored. This grew up through step by step additions, among which "homework" was one. I think that we should misread it—

built up in this way as it was—if we supposed that the process indicated more than a desire to make sure that the specified details should be included. Indeed, even though the whole parenthesis had been struck out while the original plan remained, I should have put it down to the belief that it was unwise to specify so much, lest the specification be taken as exhaustive. But that did not happen; the section, which had apparently died with the Senate plan, was lifted out of that setting, and was put into the compromise bill as it had stood originally. It would be indeed a far cry to infer from that that all the items which by accretion had made their way into the parenthesis were in this way excised from the Administrator's powers. Indeed, if so —as he argues—he could not even regulate labels, for, although § 11(c) gives him power over records, it does not give him power over these.

Finally, I cannot see that the Puerto Rico and Virgin Island amendment to § 6 stands in the way. When the Act was first passed it was not in it; it remained for two years just as it was. It would be unsafe to interpret the original meaning by an amendment made two years later; certainly, when it was a specific and detailed provision, applicable to islands where the conditions were quite different from those in the continental United States.

SWAN, Circuit Judge (dissenting).

These are petitions under section 10 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 210, by home workers and employers of home workers in the embroideries industry to review a wage order of the Administrator which establishes a minimum wage rate of 40 cents an hour and prohibits, with very limited exceptions, home work. No one questions the validity of the minimum wage portion of the order. My brothers hold valid the prohibition of home work. I shall attempt to state briefly the reasons why I cannot agree with them.

Section 5 of the Act provides for the appointment by the Administrator of industry committees, each such committee being composed of representatives of the public, of employees and of employers in the industry. Section 8 prescribes the duties of the committee and of the Administrator after the committee has filed a report containing its recommendations. Subsection (b) requires that after investigating conditions in the industry the commit-

tee "shall recommend to the Administrator the highest minimum wage rates for the industry which it determines * * * will not substantially curtail employment in the industry." Under subsection (c) the committee may recommend classifications within the industry but the wage it recommends must not "substantially curtail employment in such classification," nor give a competitive advantage to any group in the industry." Under subsection (c) the report containing its recommendations the Administrator must give a hearing to interested persons and shall by order carry the recommendations into effect, if he finds that they are lawful and supported by the evidence adduced at the hearing, and, "taking into consideration the same factors as are required to be considered by the industry committee," will carry out the purposes of section 8; otherwise he must disapprove such recommendations and again refer the matter to the same or another industry committee for further consideration and recommendation. Subdivision (d). Subdivision (e) provides that no order issued under section 8 shall remain in effect after expiration of the statutory rates specified in section 6. Then follows subdivision (f) under which the Administrator claims his power to prohibit home work. It reads as follows: "Orders issued under this section shall define the industries and classifications therein to which they are to apply, and shall contain such terms and conditions as the Administrator finds necessary to carry out the purposes of such orders, to prevent the circumvention or evasion thereof, and to safeguard the minimum wage rates established therein. * *"

The committee which recommended the 40 cent minimum wage for the embroideries industry made no recommendation as to the abolition or restriction of home work. This issue was never presented to the committee. Had the committee known that the wage it recommended was to be accompanied by such a restriction, which, as Judge Hand well says, "will disorganize and make over the industry, break up much family economy, and produce conditions which cannot possibly adjust themselves" for a considerable period of time, the committee might well have withheld its recommendation of a minimum wage rate lest employment in the industry be substantially curtailed. The Administrator, it is true, has made a finding that employment will not be substantially curtailed. But this finding adds no support to the validity of the order in my opinion. The issue of curtailment of employment by reason of the prohibition of home work was interjected without statutory authority into the hearing held under § 8(d). That hearing is to determine whether the committee's recommendations are made in accordance with law, are supported by the evidence, and will carry out the purposes of the section, "taking into consideration the same factors as are required to be considered by the industry committee." As already noted the prohibition of home work was not presented to the committee and consequently was not a factor considered or required to be considered by it. Bearing in mind that under section 8(d) the Administrator must either adopt or reject the recommendations of an industry committee and is given no discretion to modify them, and that such committee is repeatedly admonished to determine that its recommendations will not substantially curtail employment, it appears to me unreasonable to suppose that Congress intended the incidental powers conferred by section 8(f) to authorize the Administrator in his uncontrolled discretion to take action so radical as to alter the whole structure of an industry and cause one-third of the employees engaged therein to become factory workers or to give up their employment. In my opinion "such terms and conditions" as the Administrator finds necessary "to carry out the purposes of the order or prevent evasion thereof" mean terms and conditions which are truly incidental to administration, that is, requirements as to keeping records, filing reports, etc. And this finds confirmation, I think, in the fact that the act as finally passed omitted the parenthetical definition which appeared at one stage of the legislative history of section 8(f), namely, "such terms and conditions (including the restriction or prohibition of industrial home work or of such other acts or practices) as the Board finds necessary to carry out the purposes of such orders * * *." In my opinion so much of the order as prohibits home work should be set aside.