Gross v. Philadelphia Contributionship

*Bernard M. Gross* and *Gross & Sklar*, for plaintiff.

*Henry Sawyer*, for defendants.

KALISH, *J.*, May 15, 1975—

## I. HISTORY

Plaintiff, a policyholder in the Philadelphia Contributionship (hereinafter known as the "Contributionship"), brings this class equity action to compel the distribution to all policyholders of a surplus of over $25,000,000 contained in an unallocated fund or, in the alternative, all of the Contributionship's annual net income. She alleges that the maintenance of so large a surplus is unnecessary and excessive, serves no legitimate corporate purpose and contravenes the corporate charter and relevant statutory and case law. She further contends that the failure of the directors to distribute this allegedly excessive surplus among the policyholders is arbitrary, inconsistent with the purpose for which the Contributionship was formed and constitutes an abuse of discretion and lack of good faith on their part.

Defendants contend that the surplus is needed for the safe and effective operation of the corporation; that there is thus no abuse of discretion on the part of the directors.

Defendants do not contest the propriety of the class action.

## A. CLASS ACTION

The court must determine whether plaintiff has satisfied the prerequisites of a class action. See

Johnson v. City of Baton Rouge, 50 F. R. D. 295 (D.C. La., 1970); Lesch v. Chicago & Eastern Illinois Railroad Company, 279 F. Supp. 908 (D.C. Ill., 1968). We make such a determination independently of our determination as to the merits of the suit: Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974); Piltzer v. Independence Federal Savings & Loan Association, 456 Pa. 402, 319 A. 2d 677 (1974).

The maintenance of a class action in our State courts is governed by Pa.R.C.P. 2230 which provides, in relevant part:

"(a) If persons constituting a class are so numerous as to make it impracticable to join all as parties, any one or more of them who will adequately represent the interest of all may sue or be sued on behalf of all, but the judgment entered in such action shall not impose personal liability upon anyone not a party thereto."

Accompanying Rule 2230(a) is a note of the Procedural Rules Committee which states: "This subsection adopts the practice under Pennsylvania equity rule 16 and Fed.R.C.P. No. 23(a) in providing for a class suit where the members of a class are so numerous as to make it impractical to join all as parties."

The Federal rule referred to in the drafters' note is Rule 23 as it existed in 1940 when Pennsylvania Rule 2230 was adopted. Rule 2230 omitted the tripartite categorization of classes found in 23(b) of the Federal rules. In 1966, sweeping changes were made in Rule 23, two of which were the elimination of the true-hybrid-spurious class distinction and the provision of notice to class members under certain circumstances.

Plaintiff has adequately averred a class action in her complaint as it has been titled and the pleading framed so as to identify the suit as a class action and to give some indication of the class being represented. Penn Galvanizing Company v. Philadelphia, 388 Pa. 370, 130 A. 2d 511 (1957).

To maintain a suit as a class action, plaintiff-representative must be a member of the class she purports to represent and her interests must be consonant with those of the other class members: Daye v. Commonwealth of Pennsylvania, 344 F. Supp. 1337 (E.D. Pa., 1972), affirmed 483 F. 2d 294 (3rd Cir., 1973); Penn Galvanizing Company v. Philadelphia, supra. She is a perpetual policyholder in defendant corporation. Those whom she represents are also perpetual policyholders in defendant corporation. Whatever right or benefit denied plaintiff or whatever wrong suffered by her is identical to that denied or suffered by other members of the asserted class. Thus, plaintiff is a member of the class she purports to represent; she may properly represent all other perpetual policyholders similarly situated and has standing to bring the present suit. She represents a legally cognizable class, namely, approximatley 16,970 perpetual policyholders.

The purported class has been defined with "some precision." See Dolgow v. Anderson, 43 F. R. D. 472 (E.D. N.Y., 1968); Penn Galvanizing Company v. Philadelphia, supra. The exact number of class members and their identities can easily be obtained from defendant's records.

Due to the critical relationship between adequacy of representation and due process of law, courts have traditionally expressed concern for the adequacy of representation in a class action, since

the judgment conclusively determines the rights of absent class members: Eisen v. Carlisle & Jacquelin, 391 F. 2d 555, 562 (2nd Cir., 1968) "Eisen (II)." Due process as well as necessity for confidence in the judicial process require assurance that the representative parties can be counted on to faithfully defend the interests of all members of the class: duPont v. Wyly, 61 F. R. D. 615 (D.C. Del., 1973). Thus, a judgment in a class action is only binding on those class members whose interests have been adequately represented by existing parties to the litigation: Sam Fox Publishing Co., Inc. v. United States, 366 U.S. 683 (1961); Hansberry v. Lee, 311 U.S. 32 (1940).

In a "true" class action absent fraud or collusion, a judicial determination is res judicata as to all class members: Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356 (1921); Noonan v. McQuire, II D. & C. 2d 513 (1955). This is a "true" class action.

A single plaintiff may represent the entire class, no matter how small his claim, if other factors indicate that he will fairly and adequately protect the interests of the class: Green v. Wolf Corporation, 406 F. 2d 291 (2nd Cir., 1968); Eisen (II), supra;[1] Epstein v. Weiss, 50 F. R. D. 387 (E.D. La., 1970). Nor does adequacy of representation require that other class members seek to intervene as representative parties: Green v. Wolf Corporation, supra; Tober v. Charnita, Inc., 58 F. R. D. 74 (M.D. Pa., 1973). The attorney for the class should be "qualified, experienced and generally able to conduct the proposed litigation." Eisen (II), supra, at 562. Moreover, the court must be assured that the rep-

---

1. In Eisen (II), supra, a single plaintiff with damages of only $70 was allowed to represent a class of some 3,750,000 individuals.

resentative, acting through competent counsel, will vigorously prosecute the rights of the class: Dorfman v. First Boston Corporation, 62 F. R. D. 466 (E.D. Pa., 1974); Management TV Systems, Inc. v. National Football League, 52 F. R. D. 162 (E.D. Pa., 1971).

Plaintiff has satisfied the above-cited criteria. The fact that she alone purports to represent so large a class is not fatal to a finding of adequate representation. "If we have to rely on one litigant to assert the rights of a large class then rely we must." Eisen (II), supra, at 563. It is obvious that plaintiff has a financial interest in the litigation. However, plaintiff's motives are not determinative: principle coupled with the hope of rectifying a claimed loss and the prospect of substantial recovery, may be as strong a spur to vigorous prosecution as many other motivations: Dorfman v. First Boston Corporation, supra at 473. Mr. Gross also has a financial stake in the litigation, both as husband of, and counsel for, plaintiff. His substantial economic interest in the litigation serves to guarantee his vigorous prosecution of the suit on behalf of the plaintiff-representative and the class she represents. See Dolgow v. Anderson, supra, at pages 494-95.

Moreover, Mr. Gross has proven himself to be a competent attorney. His presentation has reflected diligent and careful attention to the interests of the class his client purports to represent. Nor is there any evidence to contradict our assumption that members of the bar are skilled. See Dolgow v. Anderson, supra. The fact that plaintiff has failed to demonstrate that the entire class or a major part of it considers her representation adequate, is also not

critical to our determination, since she has no affirmative duty to do so. Eisen (II), supra.

On the basis of the facts and circumstances of the instant suit, we conclude that notice to absent class members need not be given.

Rule 2230 is silent on the giving of notice. Amended Rule 23 specifically mandates notice to class members of a b(3) action only. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974), and Wetzel v. Liberty Mutual Insurance Company, 372 F. Supp. 1146 (W.D. Pa., 1974), affirmed in part, vacated in part on other grounds, 508 F. 2d 239 (3rd Cir., 1975).

Subdivision (d)(2) of amended Federal Rule 23 makes provision for discretionary notice. "In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum." Advisory Committee Notes to Rule 23. Class cohesiveness and unity are present here. As stated earlier, the instant suit, unlike a "spurious" or (b)(3) class action, is one in which the class representative and the class share the same interest in the subject matter or the litigation, bear the same legal relationship to defendant corporation which allows them to assert the same claim, and are entitled to the same relief, if granted.

Our finding of adequate representation likewise makes notice unnecessary. It is our view that, in an action such as the instant one, unlike a (b)(3) class action, the essence of due process is adequacy of representation of the interests of the absent class members by the named representatives, not notice to the class: Northern Natural Gas Company v. Grounds, 292 F. Supp. 619 (D.C. Kansas, 1968), reversed in part on other grounds, 441 F. 2d 704

(10th Cir., 1971), cert. denied, 404 U.S. 951 (1971). See Wetzel v. Liberty Mutual Insurance Company, supra. By finding that the class representative possesses the qualities necessary to protect the interests of the other class members, we are, in effect, assuring absent class members their day in court under conditions which satisfy the requirements of due process.

## II. DISCUSSION ON THE MERITS

Plaintiff contends that the corporate purpose, as set forth in the charter, precludes the Contributionship from accumulating a surplus of approximately $25,000,000.

The charter, and the resolutions by majority vote authorize the establishment of a surplus and the payment of dividends. The authorization, declaration and payment of such dividends from accumulated surplus notwithstanding that the Contributionship was formed "apart from private gain" has been upheld. No limit is set on the amount that may be accumulated. Nor does the charter or subsequent resolutions confer on the policyholders an absolute right in the surplus. Until it is declared, no policyholder has a right to demand any part of it. The resolution of 1895 merely affirms, and the resolution of 1963 reaffirms the discretion of the directors to make distribution "as they may deem safe and prudent" and such resolutions are valid and binding. See McKean v. Biddle, 181 Pa. 361, 37 Atl. 528 (1897); Commonwealth ex rel. v. Philadelphia Contributionship, 242 Pa. 209, 88 Atl. 929 (1913).

In a mutual company, the members' rights are determined by the charter, the articles of incorporation and the bylaws as well as controlling statutes and their contract with the company must be con-

strued with reference to them. Moreover, all persons insured by a mutual company whether original holders or assignees, are presumed to know the company's laws and regulations and are bound by them: Burger v. Farmers' Mutual Insurance Company, 71 Pa. 422 (1872). Plaintiff and other policyholders accepted their policies subject to the conditions regarding accumulation of surplus and distribution of dividends set forth in the charter and subsequent amendments and resolutions. Good or bad, these amendments and resolutions were adopted in good faith pursuant to a right to amend and express the will of the contributors.

Nor does the accumulation of a $25,276,547 surplus and the failure to distribute it contravene statutory law. The Contributionship is subject to the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, 40 P.S. §341, et seq. Plaintiff cites section 677, which reads, in pertinent part:

"The surplus of any domestic mutual fire insurance companies . . . shall be held as a reserve for the payment of losses and expenses; and, in the event of dissolution of the company, shall be divided pro rata among the policyholders . . ."

Plaintiff contends that this section reflects a specific legislative intent to prevent undue or excessive accumulation beyond that necessary as a "reserve for the payment of losses and expenses." However, the legislature has not specified a statutory ceiling on the amount of surplus that may be accumulated. Nor does the act require the distribution of any accumulated surplus or afford policyholders the right to compel distribution of that surplus. Section 916, which is applicable to defendant corporation, deals only with a minimum surplus and the maintenance of a surplus in excess of the minimum is clearly permissible. Had the

legislature intended to set a limit on the amount of surplus a mutual fire insurance company such as the Contributionship may accumulate, it would have done so.

Courts have traditionally been reluctant to interfere in the internal management of a corporation and supplant the discretion and judgment of the directors to whom the disposition of corporate earnings have otherwise been entrusted. Courts undoubtedly have the power to review the actions of corporate management and interfere by compelling the distribution of dividends: Jones v. Costlow, 349 Pa. 136, Atl. 460 (1944); McLean v. Pittsburgh Plate Glass Co., 159 Pa. 112, 28 Atl. 211 (1893). However, they will not interfere unless plaintiff establishes bad faith, arbitrary or manifestly erroneous action, clear disregard of official duties or abuse of discretion on the part of the directors: Hopkin v. Union Canvas Goods Company, 104 Pa. Superior Ct. 264, 158 Atl. 301 (1932); Pardee v. Harwood Electric Company, 262 Pa. 68, 105 Atl. 48 (1918); Guttmann v. Duquesne Brewing Company, 120 Pitts. L.J. 453 (1972).

Whether the maintenance of a $25,276,547 surplus and the failure to distribute such surplus constitutes an abuse of discretion and lack of good faith, as plaintiff contends, depends on the facts and circumstances of the case.[2]

---

2. This court recognizes that the issue here is not the failure or refusal to declare and pay dividends in the usual sense for the policyholders have been regularly receiving dividends consistent with the schedule established by defendant corporation. Instead, plaintiff requests the court to compel distribution of moneys in addition to the dividends ordinarily received. However, we view the request as analagous to that regarding distribution of dividends so we shall be guided by the law pertaining to such distribution.

Perpetual insurance is unique in that the insured makes a single premium payment in exchange for the insurer's promise to pay an insured loss in perpetuity. The premium is a deposit which is returnable upon cancellation of the policy. Not only may no additional premiums be collected, the premium is also not designed to be consumed during the course of the coverage so that the insurer may not utilize the premium deposits to pay business expenses. Thus, unlike a conventional insurance company which derives its income from two sources, periodic premiums and income from investments, the Contributionship, a perpetual company, must rely solely on income from investments of the single premium deposits to pay losses, expenses and dividends. The directors must be particularly sensitive to the yields from its securities, in determining corporate policy regarding disposition of earnings. In the past few years, the industry has been confronted with an unprecedented volume of insurance losses combined with increased costs and a decrease in surplus due to a marked decline in the market value of investments. As a result, the financial solvency of some companies has been threatened while others may be unable to write new policies or increase coverage on present ones.

The Contributionship has likewise been experiencing the same detrimental combination of increasing costs and decreasing surplus. Over a two-year period from 1972-74, underwriting loss has increased markedly by over 20 percent while the market value of the Contributionship's investment portfolio has declined by over $13,000,000 (a $9,000,000 decline in 1974 alone) resulting in a decrease in total surplus of over $12,000,000. At the same time, insurance at risk has continued to steadily increase as the Contributionship writes

new policies; more money is being paid out in dividends in accordance with the Aging of Deposit Schedule, and less is being taken in as adjusted net income after dividends.

Furthermore, the directors must consider what is known in the casualty industry as the "ruin problem" in determining the disposition of earnings. The ruin problem is the likelihood, however remote, that a combination of adverse circumstances such as a material decline in investments, a catastrophic loss or a marked increase in ordinary loss and rising expenses will occur simultaneously. Such a situation is a matter of particular concern to the Contributionship. Unlike a conventional insurance company, defendant corporation cannot rectify unexpected losses or other adverse circumstances by increasing premiums. The Contributionship has already collected the only premium to which it is entitled as to insurance at risk. Increasing the premiums on future policies also would not ameliorate the problem since interest generated from investment of such premiums would not materially increase surplus in the immediate future. Nor is selling new policies the solution because the premium is returnable, dividends payable on each dollar of a new premium exceeds the rate of return on investment of the dollar and new policies increase the exposure of the company. In addition, the overwhelming bulk of the Contributionship's policies include extended coverage for such perils as damage by hurricane, tornado and the possibility of catastrophe; and the bulk of the exposure is concentrated in a relatively small geographical area, that of Greater Philadelphia, two factors which increase the company's susceptibility to the "ruin problem."

Plaintiff had made much of the ratio between the

Contributionship's assets and liabilities. She has pointed out that as of December 31, 1974, assets totaled $34,154,638, $25,276,547 of which consisted of earned surplus, while liabilities only totaled $6,005,360, of which $5,738,018 were deposit premiums. Plaintiff stresses that the safety factor as measured by a comparison of assets to liabilities is appreciably greater than the average safety factor for large conventional fire insurance companies. She also cites the fact that although from 1972-74 the total amount of insurance at risk has more than doubled, the amount of actual expenses has increased at a substantially lower rate. In plaintiff's view, such statistics support the conclusion that the accumulated surplus of over $25,000,000 is in excess of that necessary to defendant's effective and safe operation as a fire insurance company and that the retention of such surplus constitutes an abuse of discretion and a lack of good faith on the part of the directors.

However, defendant corporation has produced convincing testimony that leads us to a different conclusion. The size of assets and liabilities per se is meaningless. Moreover, there is no authority or commonly accepted guideline governing the size of the surplus of perpetual companies. The only relevant measure of strength appears to be the ratio of surplus to "insurance at risk." Insurance at risk is the company's maximum exposure; the larger the insurance at risk, the larger the expectation of loss. In this regard, defendants point out that in the last ten years, the insurance at risk has more than doubled, that the margin of safety, as indicated by the ratio of surplus to insurance at risk, has declined. Furthermore, with the exception of one company

which pays no dividends, the Contributionship has the least surplus in proportion to its exposure of any of the other American perpetuals.

Defendant corporation asserts that the unallocated surplus is indeed necessary to its safe and effective operation. The chairman of the board of directors has testified that in the judgment of the board, the surplus must be maintained in light of the Contributionship's total reliance on investment income which increases its vulnerability to fluctuations in the economy and restricts its means of adjusting to financial reverses caused by such fluctuations. The surplus is also viewed as a financial buffer which would enable the corporation to provide insurance coverage and sustain losses under the most adverse of circumstances, as typified by the ruin problem, without having to impinge on the deposit premiums. Defendants further assert that in order to run at a profit and meet its dividend obligations, the surplus must continue to grow. It is pointed out that the Contributionship has followed a consistent policy of paying out dividends since the directors were authorized to do so in 1895. Dividends were, in fact, increased by a total of 25 percent in 1973. Moreover, due to the aging of policies, a steadily increasing amount is being paid in dividends. If surplus were to remain the same while the business continues to expand, the payment of dividends would consume an increasing proportion of the net income. As the net income is used to pay underwriting losses as well as dividends, the company would eventually be forced to cut dividends or run at a deficit. To underscore the inadvisability of depleting the current surplus, defendants presented projections establishing the adverse con-

sequences of distributing varying amounts of the surplus.[3] Defendants also presented calculations establishing adverse consequences of paying out all of the annual net income in the form of larger dividends while retaining the current surplus.[4] Plaintiff has failed to refute this evidence.

The evidence presented leads us to conclude that in accumulating and maintaining an unallocated surplus of $25,276,547, the directors of defendant corporation have neither exceeded the discretion accorded them by the resolutions of 1895 and 1963, nor acted in any other way which would warrant our interference with their judgment and discretion regarding the disposition of net earnings. The mere existence of a large unallocated surplus is insufficient grounds for compelling the requested distribution. See Jones v. Costlow, supra; Green v.

3. One such projection assumed the retention of a $10,000,000 surplus, the upper limit suggested by plaintiff's expert witness, as sufficient for the Contributionship's safe and effective operation. The projection was based on the additional assumptions that the market value of the investment portfolio and the rate of return would remain the same as that of December 31, 1974, expenses and deposit premiums would increase at the same rate as in 1974 and that there were no unusual or catastrophic losses. The projection demonstrated that in 1976 the Contributionship would be running at a deficit even without having to pay dividends. A similar projection based on a surplus of $20,000,000 indicated that the Contributionship would sustain a net loss in the next year if dividends were paid out.

4. These calculations assumed the same increase in expenses as that experienced in the two-year period of 1973-74 and an arithmetical increase in dividend payments in accordance with increases experienced the previous year. The result of these calculations were that by the end of 1978 dividends would have to be reduced and that by 1981 defendant will be operating at a deficit unless some portion of the net income is added to surplus.

Philadelphia Inquirer Company, 329 Pa. 169, 196 Atl. 32 (1938); Guttmann v. Duquesne Brewing Company, supra. Moreover, we are satisfied with the justification given us by defendants for the maintenance of the surplus. The directors have taken into account such factors as the idiosyncracies and financial resources of the company, the state of the economy, and trends in the casualty insurance industry in general and in the company in particular, in reaching their conclusion that an unallocated surplus of over $25,000,000 is necessary to secure the financial stability of the company and to enable it to meet its obligations to policyholders under the most adverse of circumstances. That the surplus plays such an important role in the Contributionship's contingency planning is not unreasonable since the essence of its operation as an insurance company is to provide for the unlikely.

It should be noted that the resolutions of 1895 and 1963 authorize distribution from portions of the net income, not from surplus. The evidence establishes that, in accordance with the resolutions, the directors have been making provision for losses and depreciation of assets and have been making accumulations to assets "as they deem expedient." It is only after such actions are taken and on further condition that the directors deem it "safe and prudent" that distribution from the net income can be made in the form of dividends. It is uncontested that policyholders have been receiving dividends regularly and in accordance with defendant corporation's distribution schedule. Defendant corporation has also presented unrefuted evidence that the distribution of all of the annual net income, while leaving the surplus intact, could jeopardize the company's ability to meet its obligations and run at

a profit in light of the present state of the economy and its effect on the Contributionship's financial condition. We, therefore, see no reason for substituting our judgment for that of the directors on account of their failure to make any greater distribution of the net income than that which they have deemed "safe and prudent."

## III. FINDINGS OF FACT

1. The Philadelphia Contributionship for the Insuring of Houses from Loss by Fire was incorporated by the General Assembly of the province of Pennsylvania, by an Act passed February 27, 1768.

2. It had been in existence as an unincorporated "Society for the Insurance of Houses from Loss by Fire upon the most equal Terms, and apart from all Views of private or separate Gains or Interest" under articles of agreement dated March 25, 1752.

3. The society was a mutual insurance company, of which those who were insured in it were the members and, as such, entitled to take part in its government and participate in any division of profits it might make.

4. It was provided in the articles of agreement, or deed of settlement as it was called, that any general meeting of the members of the society should have full power "to alter and amend the present Articles and make any Additional Rules or Articles for the better and more orderly and successful or satisfactory Management of the Affairs of this Society."

5. At all meetings of the Contributionship, the determination of a majority of the members present shall be conclusive and binding on the whole society.

6. By the revision of April 9, 1810, as amended April 14, 1836, it was resolved that every policy

thereafter issued by the society should be made to continue in force for an unlimited period; that the society may, upon giving 30 days' notice, cancel any policy, and that the assured may, upon giving five days' notice and surrendering the policy, withdraw the deposit money, allowing a deduction of five percent.

7. It was unanimously agreed in 1763 that the interest money arising from the stock should be carried to one common account and be applied as directed by the deed of settlement in discharging the expenses of the office, "the surplus or remainder may be paid towards satisfying any loss that shall happen by fire, . . ." Second, that "no part of the deposit money shall be expended in repairing or paying for any damage done by fire until the balance of the interest money, as shall be accrued to the time of such fire, be first expended."

8. In view of the large fund in the hands of the company, and the large amount of interest annually earned by it, the membership at a meeting held February 18, 1895, adopted the following resolution:

"Resolved, that the present assets of the company shall remain intact, and that the directors be and they are hereby authorized from time to time, at their discretion, to distribute among the policyholders of the corporation, in proportion to their deposits held by the company on policies in force respectively, such portion of the net income from invested funds as they may deem safe and prudent, after providing for losses and depreciation of assets, and making such additions to the assets as they may deem expedient; provided, that all deposits made after this date shall remain at least ten years before the holder of policies issued thereon shall

receive any benefit under this resolution; provided further, that all deposits received shall be added to the assets of the company."

9. At a stated meeting of the directors of the corporation, held November 20, 1895, the following resolution was passed:

"That we deem it safe and prudent, out of the net income from invested funds, to distribute among the policyholders ten percent of their deposits held by the company, and which has been so held prior to February 18, 1895, on policies in force at this date."

10. By resolution of the membership in September of 1963 (hereinafter called the 1963 resolution), the authorization of 1895 was reiterated and the directors were again authorized to distribute, from time to time, at their discretion, "such portion of the net income from invested funds as they may deem safe and prudent, after providing for losses and depreciation of assets, and making such additions to the assets as they may deem expedient . . ." The resolution also reduced the period of membership requisite to eligibility for receipt of dividends from 10 years to one year.

11. Harriet S. Gross, a plaintiff in this action, is an individual residing at 1602 Harris Road, Cheltenham, Pa.,

12. H. Gates Lloyd, Geoffrey S. Smith, Morris Duane, R. Stewart Rauch, Jr., J. Peter Williams, Owen Jones Toland, M.D., J. Truxton Hare, Jr., Courtlandt S. Gross, Stephen S. Gardner, Richard C. Bond, Thomas S. Gates, and Marvin Wachman are members of the Board of Directors of the Contributionship.

13. Since 1968, Harriet S. Gross has been a policyholder-member of the Contributionship, hav-

ing acquired her policy by purchase from the previous owner of her residence.

14. The distribution of dividends to policyholders is in accordance with a schedule based on the age and amount of the deposit. At the present time, the directors pay a dividend of five percent on policies in force over one year; 10 percent for policies in force for five years and less than 10 years; and 20 percent on policies in force 10 years and over.

15. As of September 30, 1974, one-third of the deposit premiums were returning 20 percent to the policyholders. The number of policyholders graduating into the ten percent and 20 percent dividend classes increases each year.

16. As of December 31, 1974:

(a) $5,735,018 is held in deposit premiums which are returnable on demand and classified as a liability.

(b) The insurance at risk, the maximum exposure of the company, is $231,826,376.

(c) The underwriting loss, consisting of actual loss, loss adjustment expense and costs of operation, was $582,150.

(d) Total surplus, assets over liabilities, was $28,149,278. The total surplus consists of $2,872,731 in unrealized appreciation of stock at market value and $25,276,547 of unallocated surplus.

17. Over a two-year period from December 31, 1972, to December 31, 1974, the underwriting loss has increased by 19.5 percent while the total surplus has decreased by almost $12,000,000. In addition, the market value of securities owned by the Contributionship declined by over $13,000,000.

18. In 1973, the Contributionship paid $538,000 in dividends; in 1974, $551,000. Adjusted net in-

come after dividends in those respective years was $584,995 and $521,432.

19. Since 1931, the Contributionship has been subject to the Insurance Company Law of Pennsylvania.

20. The overwhelming bulk of the policies includes extended coverage such as accidental damage by water leak, vandalism, building collapse; damage by hurricane, tornado or other high winds, and possibility of catastrophe.

21. Approximately 90 percent of the Contributionship's risk is concentrated in the Greater Philadelphia area.

22. The traditional measure of strength of a casualty insurance company, a comparison of unearned premium reserve and net assets, is inapplicable here, since a perpetual company never earns a premium and carries no such figure as "unearned premium reserve."

23. The only available measure of strength of a perpetual insurance company is the ratio between surplus and insurance at risk. In the ten-year period between 1964-74, this ratio was dropped from 31.23 percent to 12.1 percent.

24. As a mutual perpetual insurance company, the Contributionship's only source of income for paying losses and dividends is income from investments; the deposit premiums are not designed to be consumed during the course of the coverage. In contrast, a conventional insurance company derives income from both periodic premiums and income on investments and the premiums are designed to be consumed during the course of the coverage.

25. Unlike a conventional insurance company,

the Contributionship, a perpetual company, cannot rectify unexpected adverse situations by raising premiums, since it has already collected the single premium deposit required of policyholders and cannot obtain any additional premiums.

26. The combined recession and inflation that has characterized the present state of the national economy has adversely affected the casualty insurance industry in general and the Contributionship in particular. Costs are rising as surplus is declining.

27. No notice of these proceedings was given to absent class members.

## IV. CONCLUSIONS OF LAW

1. Plaintiff has brought this suit as a class action on behalf of herself and all perpetual policyholders similarly situated.

2. Plaintiff has no adequate remedy at law.

3. Plaintiff may properly maintain the suit as a class action.

4. There has been no abuse of discretion, bad faith, or arbitrary or erroneous conduct on the part of the directors or the defendant Corporation in the accumulation of the surplus. Therefore, the court enters the following

## DECREE NISI

And now, to wit, May 15, 1975, upon consideration of the foregoing, it is hereby ordered, adjudged and decreed that the action of plaintiff is dismissed and judgment entered for defendants.